ROBERT CARROLL et al., Plaintiffs-Appellants, v. LLOYD R. HURST, Defendant-Appellee.

Fourth District    No. 16795

Opinion filed February 4, 1982.

Curtis W. Myers, of Pontiac, for appellants.

Robert W. Travers, of Fellheimer Law Firm, of Pontiac, for appellee.

JUSTICE LONDRIGAN delivered the opinion of the court:

Plaintiffs appeal from a decision of the trial court dismissing their petition for an injunction against the defendant, Lloyd Hurst. The trial judge impaneled an advisory jury which heard the evidence in the case and which answered, in favor of the defendant, six special interrogatories. The court adopted the findings of the advisory jury and entered a decree dismissing counts I and II of plaintiffs' complaint.

Plaintiffs filed a complaint on June 29, 1978, alleging that defendant's operation of a junkyard and salvage operation on his property (1) was not a valid nonconforming use under the Livingston County zoning ordinance, (2) that even if the use was a valid nonconforming use such status had been lost due to the expansion and alteration of the use by the defendant; and (3) the use of the property by the defendant as a junkyard constituted a private nuisance.

Defendant is the owner of an 11.56-acre tract located in Rooks Creek Township, Livingston County. The land in question is primarily agricultural and is located southwest of the city of Pontiac. Plaintiffs are owners of land which is either adjacent to or near the tract in question. None of the plaintiffs reside within less than one mile of the defendant's property.

The property was originally a portion of a tract owned by Clarence Law, Sr., who purchased the land in 1964. Mr. Law started a junk business on the site in 1962. He operated the junk business until 1968, when he entered into business with Percy Decker. Decker operated the Pontiac Scrap Yard. No active junking operation was in existence on the Rooks Creek property at this time; it was used as an area to store excess scrap. Percy Decker closed the Pontiac Scrap Yard in 1972 and gave the junk to his son, Bill. Clarence Law, Sr., gave his permission to Bill Decker to store junk on the Rooks Creek property. Decker hauled junk out to the property on a regular basis.

Defendant testified that, when he purchased the property in 1978, approximately 80 to 100 wrecked vehicles and used machines were present on the property. Some of the junk had been hauled from the Pontiac Scrap Yard after it closed in 1972. Between 1972 and 1978, Bill Decker made weekly trips to the property with loads of junk. Decker would haul small loads to the Rooks Creek site until he had accumulated enough junk to haul to the scrapyard in Peoria. He did not haul scrap out as quickly as he hauled it in, creating an ever-increasing inventory of scrap on the property.

Decker did not unload the junk in any set pattern. He put the scrap down wherever he wanted. He estimated that the junk covered a seven-acre area. Decker indicated that about one-half of the junk was located on the portion of the tract now owned by the defendant.

There was conflicting testimony about the number of vehicles present on the tract between 1972 and 1978 and the number present at the time of the hearing. Clarence Law, Sr., testified, in a somewhat confusing manner, that between 80 and 100 cars were present on the tract in 1972 and a similar number in 1978, although he thought "Bill was getting more in and not hauling as much out." He testified that he thought the defendant had 340 or 400 cars on the property at the time of the hearing.

Defendant testified that he moved approximately 100 cars to the property after he bought the property in 1978. He stated that about 200 cars were located on the property at the time of the hearing.

Plaintiffs also presented testimony on the alleged harmful effects on adjacent properties caused by the operation of the junkyard. Plaintiff Richard Roberts testified that the storage of vehicles adjacent to Pike Creek slows the flow of water from his property to the south. Roberts also testified that he had difficulty renting out a house on property he owned near the Hurst property. On cross-examination, Roberts admitted that the rental property had only been vacant since March of that year and that he had had several inquiries about the property in response to a newspaper ad. Roberts also complained about the noise coming from the Hurst property late at night.

Jake Bauman testified that he owned property adjacent to the tract in question. In March of 1979, a flood of exceptional size occurred in the area around Pike Creek. Bauman stated that he saw "three or four tires" that had been washed off defendant's property; however, none of the debris ended up on Mr. Bauman's land.

The trial judge submitted six special interrogatories to the jury. The jury answered all six interrogatories in a manner favorable to the defendant. The trial judge incorporated the jury's answers to the special interrogatories into a "judgment order" dated June 3, 1980.

The Livingston County zoning ordinance became effective on February 1, 1974. It provided:

"The lawful use of a building or premises, existing at the time of the effective date of these regulations, may be continued although such does not conform to all the provisions thereof, except as hereinafter provided." Livingston County zoning ordinance, §25.0.

Plaintiffs contend that the operation of a junkyard by the defendant was not a valid nonconforming use under the Livingston County zoning ordinance because neither the defendant nor his predecessors had a license as required by section 5—301 of the Illinois Vehicle Code (Ill. Rev. Stat. 1973, ch. 95½, par. 5—301). Section 5—301 provided, at the time of the enactment of the zoning ordinance:

"No person in this State shall, except as an incident to the servicing of vehicles, or persons licensed as a new vehicle dealer or

as a used vehicle dealer under this Chapter, carry on or conduct the business of:

1. Selling used parts of or used accessories for vehicles; or

2. Wrecking or dismantling vehicles for resale of the parts thereof; or

3. Rebuilding wrecked or dismantled vehicles; or

4. Possess 2 or more inoperable vehicles subject to registration for more than 30 days; or

5. Engage in the business of storing, disposing, salvaging or recycling of vehicles, vehicle hulks and the parts thereof; unless licensed to do so in writing by the Secretary of State under this Section."

Plaintiffs argue that since neither defendant nor his predecessors had a valid permit under section 5—301, defendant's use of the property was not a lawful one. Therefore, plaintiffs argue, defendant's junkyard does not fit the definition of a nonconforming use set forth in section 25.0 of the Livingston County zoning ordinance and an injunction should therefore issue.

■■ As a general rule, the illegality of a prior use will result in a denial of protected status for that use under a nonconforming use exception to a zoning plan.

Some courts have carved out an exception to this general rule where the purpose of the statute that has been violated is not related to the land use or zoning. In *Trailer City, Inc. v. Board of Adjustment* (Iowa 1974), 218 N.W.2d 645, the failure of the owners of a mobile home park to renew a license required by the State board of health did not void the park's status as a nonconforming use. A similar result was reached in *Board of Selectmen v. Monson* (1969), 355 Mass. 715, 247 N.E.2d 364.

Other courts adhere strictly to the general rule. In New York, the fact that the use was permitted by a prior zoning ordinance, in the absence of a valid certificate of occupancy, did not render the use "lawfully established" within an exception for nonconforming uses in a new zoning resolution. (*Smalls v. Board of Standards & Appeals* (1961), 28 Misc. 2d 147, 211 N.Y.S. 2d 212.) The courts of Vermont have held that where a junkyard owner had not procured a license under a junkyard licensing statute for the past 15 years, his use was illegal and not entitled to protection as a nonconforming use. *In re Chamberlin* (1976), 134 Vt. 359, 360 A.2d 100.

The Illinois cases dealing with the question of whether an illegal use can be a valid nonconforming use under a zoning ordinance have usually involved violations of statutes designed to regulate the use of land. In *County of Cook v. Triem Steel & Processing, Inc.* (1958), 19 Ill. App. 2d

126, 153 N.E.2d 277, the defendants owned and operated a garbage dump within one mile of a municipality. This violated a preexisting ordinance banning garbage dumps within one mile of any municipality. The court held that an illegal use could not be a nonconforming use. See also *City of Rockford v. Sallee* (1970), 129 Ill. App. 2d 75, 262 N.E.2d 485.

In *Eggert v. Board of Appeals* (1963), 29 Ill. 2d 591, 195 N.E.2d 164, the defendant converted a three-apartment frame building into a seven-apartment frame building in 1946, without the required building permit. In 1957, the City of Chicago enacted an ordinance which imposed a minimum lot-size requirement of 2,500 square feet per dwelling unit. Defendant was in violation of the ordinance, but claimed nonconforming-use status. The supreme court held that defendant's illegal use was not a nonconforming use. The court stated:

> "But where, as here, a permit for alteration is not only unobtained, but legally unobtainable because the alterations are themselves unlawful, no right of nonconforming use can be acquired by doing the prohibited acts." 29 Ill. 2d 591, 596, 195 N.E.2d 164, 167.

■■ We think the better rule is to make a distinction between violations of statutes designed to regulate land use as opposed to violations of statutes whose purpose is totally unrelated to land use planning. The purpose of section 5—301 is, in large part, to prevent the easy disposal of stolen vehicles. (Ill. Ann. Stat., ch. 95½, par. 5—301, Source Comment, at 305 (Smith-Hurd 1971).) The statute was not designed as an aid in land use planning or environmental protection. Therefore, we hold that defendant's failure to obtain a license under section 5—301 does not operate to deny nonconforming-use status to the property in question.

Plaintiffs also argue that, assuming *arguendo* that the use qualifies as a nonconforming use, the changes in the use of the property since 1978 constitute an illegal extension of a nonconforming use. In particular, plaintiffs point to the large increase in the number of junked vehicles present on the property since it was purchased by the defendant.

In *Dube v. City of Chicago* (1955), 7 Ill. 2d 313, 131 N.E.2d 9, the court found that plaintiffs' use of their property amounted to an extension of a nonconforming use. The court said:

> "Courts have recognized that the employment of new instrumentalities and methods may constitute an objectionable extension of an existing nonconforming use where they operate to change the original nature and purpose of the undertaking. [Citations.] So also an expansion of a use to land not formerly used may be an illegal extension or enlargement of the previous nonconforming use. [Citations.] Though the new use and the old may fall within the general category of 'manufacturing' it is the particular use and not

the general classification which governs. (*Wechter v. Board of Appeals*, 3 Ill. 2d 13.) * * *. It may be, as plaintiffs contend, that a mere increase in the volume of business is not an expansion of a nonconforming use, but much more than an increase in volume is here involved * * *." 7 Ill. 2d 313, 322, 131 N.E.2d 9, 13-14.

■■ Thus, plaintiffs must show that a change in the nature or purpose of the undertaking has occurred. A mere increase in business does not constitute an illegal extension. This is in accord with the law in other jurisdictions. (See *City of Central City v. Knowlton* (Iowa 1978), 265 N.W.2d 749; *Worthington v. Everson* (1967), 10 Ohio App. 2d 125, 226 N.E.2d 570; *Kent County Planning Inspector v. Abel* (1967), 246 Md. 395, 228 A.2d 247.) The nature of defendant's use of his property has not changed. The only change in the situation is a significant increase in the number of junked cars on the premises. The trial court found that no expansion of the nonconforming use had taken place since February 1, 1974. We view this finding as being in accord with the manifest weight of the evidence.

Plaintiffs alleged that the junkyard operated by the defendant constitutes an actionable private nuisance and that the trial court's finding that the defendant's use of the property was not a nuisance was against the manifest weight of the evidence.

■■ A private nuisance is an invasion of another's interest in land in a substantial manner, done either negligently or intentionally and unreasonably. (*Woods v. Khan* (1981), 95 Ill. App. 3d 1087, 420 N.E.2d 1028). The invasion must cause a substantial annoyance to the affected landowner, without taking into account any special sensitivities the landowner may have. The trial court must balance the harm done to the plaintiffs against the benefit caused by the defendant's use of the land and the suitability of the use in that particular location. *Woods*; *O'Brien v. City of O'Fallon* (1980), 80 Ill. App. 3d 841, 400 N.E.2d 456.

■■ A reviewing court will not overturn an order of the trial court refusing injunctive relief against a private nuisance unless the order is contrary to the manifest weight of the evidence. (*City of Chicago v. Commonwealth Edison Co.* (1974), 24 Ill. App. 3d 624, 321 N.E.2d 412; *Fink v. Board of Trustees* (1966), 71 Ill. App. 2d 276, 218 N.E.2d 240.) In the case at bar, the trial court's order was not against the manifest weight of the evidence. An examination of the testimony showed that, while some junk did wash off the defendant's property during floods, none of it landed on property owned by any of the plaintiffs. No testimony was given that defendant's use of his land created an unsightly view; indeed, under Illinois law, a landowner does not have a right to a pleasing view of his neighbor's land. (*Cf. Stanek v. County of Lake* (1978), 60 Ill. App. 3d 357, 376 N.E.2d 743.) Plaintiffs also failed to establish any decline in the value of adjacent

properties attributable to the defendant's use of his property. The trial court's finding that defendant's use of the property did not constitute a nuisance is supported by the weight of the evidence.

Plaintiffs contend that the trial judge erred in incorporating into the judgment order a finding that plaintiffs' claim against defendant is barred by laches. We decline to decide this question, having already determined that plaintiffs are not entitled to injunctive relief under any of the theories advanced at trial.

Plaintiffs submit that the trial court erred in impaneling an advisory jury on its own motion and then failing to either instruct the jury or apply the law to the jury's findings.

■■ Section 63 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 63) provides that the trial court, in a case seeking equitable relief, may direct that an issue or issues be tried by a jury. The impaneling of an advisory jury is within the discretion of the trial court. (*Kjellesvik v. Shannon* (1976), 41 Ill. App. 3d 674, 355 N.E.2d 120.) The jury's verdict is only advisory; the trial court is free to accept or reject the jury's findings, in whole or in part. The court may impanel a jury under section 63 even though the parties in the proceeding object. See *Fleming v. Fleming* (1980), 85 Ill. App. 3d 532, 406 N.E.2d 879.

Plaintiffs' argument that the trial court erred in instructing the jury is not significant. The trial court was not bound by the findings of the jury, and the findings contained in the judgment order of June 3, 1980, "* * * are those of the court, and they will not be disturbed unless contrary to the manifest weight of the evidence. [Citation]." (*Ray v. Winter* (1977), 67 Ill. 2d 296, 307, 367 N.E.2d 678, 684.) We find that the decision of the trial court is supported by the weight of the evidence and that plaintiffs have failed to show any prejudice resulting from the trial court's action.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

WEBBER and TRAPP, JJ., concur.