(721 P.2d 743)

No. 58,465

STATE OF KANSAS, *Appellee,* v. J. D. SCHERER, *Appellant.*

Petition for review denied September 19, 1986.

Opinion filed July 3, 1986.

*Thomas F. McGraw, III*, of Overland Park, for appellant.

*Stephen R. Tatum*, assistant district attorney, *Dennis W. Moore*, district attorney, and *Robert T. Stephan*, attorney general, for appellee.

Before BRAZIL, P.J., MEYER, J., and DONALD L. WHITE, Associate District Judge, assigned.

BRAZIL, J.: The defendant J. D. Scherer appeals his conviction of a continuing misdemeanor violation of the zoning regulations of Aubry Township, Johnson County, Kansas, by operating a salvage yard as defined therein.

Scherer bought ten acres in Aubry Township on a contract for deed in about 1966 and obtained full title in 1968.

On July 11, 1984, Scherer was charged with willful misdemeanor violations from June 1, 1984, to July 10, 1984, of the 1982 and 1975 Aubry zoning regulations. The complaint was amended on October 2, 1984, to include violations of the 1959 regulations, and again at trial on April 24, 1985, to include violations through April 22, 1985.

At trial, the State's witnesses testified to the gradual accumulation of farm equipment, mostly horse drawn, from 1977 until the present when they estimated from 800 to 1,000 pieces were located on the property. In addition to farm equipment, they also mentioned eight trucks, a boat with motor, a couple of old washing machines, a badly damaged horse trailer, steel beams, lumber, an old bicycle, an old swimming pool, wagons, four automobiles, and other items.

The only evidence Scherer presented was his own testimony. He stated, "I farm and raise cattle and horses, and do some row cropping and hay, quite a bit of hay." The ten acres in Aubry is his home base, but most of the land he farms is in Missouri. He claimed he broke horses to use the horse-drawn farm equipment

he had and used them to farm in Missouri but later admitted he had cut little of his most recent hay crop with the horses and merely hoped to plant corn with them in the future. He finally stated he was getting ready to and hoped to use all the equipment some day. He testified he collected much of the equipment to be able to repair equipment that broke down because horse-drawn equipment is no longer manufactured. He stated that every item he had was usable with a little bit of repair work. He testified the lumber and steel beams were to be used in re-building a house that burned down, perhaps as long ago as 1970. He was also working on a metal building which he poured footings for three or four years before the trial.

The jury found Scherer guilty of maintaining a salvage yard and he has appealed.

The first two issues raised on appeal by Scherer address the adequacy of the court's jury instruction on nonconforming use.

The State claims that Scherer violated Aubry zoning regulations by willfully maintaining on his property a salvage yard as defined in the 1982 regulations and as prohibited by the 1982 regulations, the 1975 regulations, and the 1959 regulations. Scherer claimed at trial that if his use was found to be a salvage yard, that it existed at the time the 1982 regulations were passed and so could be continued as a prior nonconforming use. The trial court apparently agreed with Scherer that nonconforming use was an issue and gave the following instruction:

"The defendant is charged with violation of the zoning regulations of Aubry Township, Johnson County, Kansas, during the period commencing June 1, 1984 and ending April 22, 1985. The defendant pleads not guilty.

"The defendant alleges a non-conforming use. The term 'non-conforming uses' refers to uses of certain property which are permitted to continue if such uses were in existence at the time of the adoption of zoning regulations, and conformed to the prior zoning regulations, if any, which were in effect at the time such use commenced.

"Such 'non-conforming use' does not permit an enlargement or extension of the prior use, and any such enlargement or extension may constitute a violation of the zoning enactments."

Scherer objected to this instruction.

Scherer first claims that the instruction should have informed the jury he was entitled to acquittal if his use was a valid nonconforming use. We agree. He cites PIK Crim. 2d 52.08, which states: "If the defense asserted causes you to have a reasonable doubt as to the defendant's guilt, you should find the

defendant not guilty." The instruction given in this case merely defined "nonconforming uses" and stated a restriction on them. It did not inform the jury what effect this defense should have and it is difficult to see that it could tell from the instructions as a whole what to make of it.

Scherer next argues that the instruction failed to distinguish between permissible intensification and impermissible enlargement of a valid nonconforming use. He cites *Union Quarries, Inc. v. Board of County Commissioners,* 206 Kan. 268, 478 P.2d 181 (1970). See also *Carroll v. Hurst,* 103 Ill. App. 3d 984, 431 N.E.2d 1344 (1982); *City of Central City v. Knowlton,* 265 N.W.2d 749 (Iowa 1978); *Worthington v. Everson,* 10 Ohio App. 2d 125, 226 N.E.2d 570 (1967). Contrary to the State's assertion that abandonment of a nonconforming use was the only issue in the *Union Quarries* case, the court also considered the claim that the quarrying operations involved in the case had expanded in volume and intensity. 206 Kan. at 276-77. The court upheld the increased use because "[i]t underwent no fundamental change in quality." 206 Kan. at 277. The State further asserts *Union Quarries* is inapplicable because the Aubry regulations require the nonconforming use to be "the principal use" of the land in question. But the question here is whether the court's instruction on nonconforming use was correct. It seems entirely possible, given the evidence presented, that the jury would have concluded that a "salvage yard" as defined in the 1982 regulations was the principal use of Scherer's land and that his additions to his collection of machinery after 1982 did not constitute a fundamental change in the quality of his use.

A final problem relating to the issue of nonconforming use is the question whether use of land as a "salvage yard" as defined in the 1982 regulations was prohibited under the 1975 regulations. We believe it was not. It appears that the court relied on State's Exhibit 6, the 1975 regulations to inform the jury what uses were permitted by those regulations and then to consider the nonconforming use defense. This seems inadequate to discharge the court's duty to instruct the jury on the essential elements of the crime. *State v. Nesmith,* 220 Kan. 146, 151, 551 P.2d 896 (1976), quoting *State v. Smith,* 215 Kan. 865, 866, 528 P.2d 1195 (1974). The 1975 regulations do not appear to prohibit a "salvage yard" as defined in the 1982 regulations. "Junkyard"

is defined in the same language as "salvage yard" in 1982, but nowhere is use as a junkyard prohibited or restricted. The State, in its complaint and brief, seeks to rely on another section of the 1975 regulations to prohibit Scherer's use of his property as a "salvage yard." That section reads:

"No building material, construction equipment, machinery or refuse shall be stored, maintained or kept in the open upon any lot, tract or parcel other than in such districts as permitted in these regulations, except during actual construction operations upon said premises or related premises."

As a whole, this section would seem to prohibit storage of material, equipment, machinery, or refuse used in or resulting from *construction* operations except during actual construction rather than prohibit salvage yards. The apparent intent of the 1975 regulations was to restrict junkyards in 1975 just as salvage yards were restricted in 1982. Unfortunately junkyards were omitted from the list of special uses requiring a permit in 1975 while salvage yards were included on the list of conditional uses requiring a permit in 1982.

(We note that although Scherer was charged with violating the 1959 regulations, there is no evidence in the record of any prohibited uses prior to 1977, at which time the 1975 regulations were in effect.)

Scherer next argues the court erred in failing to instruct the jury that agricultural use of his property was exempt from the Aubry zoning regulations.

K.S.A. 19-2908 provides in part:

"No determination nor rule nor regulation shall be held to apply to the use of land for agricultural purposes, nor for the erection or maintenance of buildings thereon for such purposes so long as such land and buildings erected thereon are used for agricultural purposes and not otherwise."

This section has never been interpreted but identical language in K.S.A. 19-2921, part of the statutes permitting county comprehensive zoning plans (K.S.A. 19-2914 to 19-2926b), was considered in *Blauvelt v. Board of Leavenworth County Comm'rs*, 227 Kan. 110, 605 P.2d 132 (1980). The court held that a farmer's dwelling house was exempted by this language from zoning regulations controlling residential construction, saying, "The obvious purpose of the proviso in K.S.A. 19-2921 was to favor agricultural uses and farmers." 227 Kan. at 113. There was no question in that case that the land was agricultural land. 227 Kan. at 114.

In the present case, it is not at all clear that Scherer was using the land for agricultural purposes. He did claim he was a farmer and the ten acres was his base of operations. He further attempted to show he used the old farm equipment in his farming operations, but generally was only willing to claim he hoped to use it or used it a little bit. He explained the size of his collection was necessary to maintain a stock of repair parts. It seems conceivable the trial court could have decided the State had shown Scherer's collection of machinery as a matter of law had no agricultural purpose. This is not what the court did, however. Instead, in support of its decision not to include anything about an agricultural use exemption in the instructions, the court said:

"I just don't agree that was the intent of the statute, to say that some agricultural use or substantial agricultural use or nearly entire agricultural use of a piece of property exempts it and allows the usage of the property for any other purposes. The purpose of the statute, as I understand it, was to encourage agriculture uses; but it does not exempt the property from being zoned for the purpose of proscribing or prohibiting uses that are not agricultural. . . . It is entirely possible that some uses or substantial usage of the property for agricultural purposes gives it an entire blank check and allows the property to be used for any other purpose that the owner desires. . . . These cases all relating to, as I read them, agricultural uses which the Court has found to be agricultural uses. And I find no problem with any of the usages described in these cases.

"The feed lot case presents no problem to me. I can understand where that could be found to be entirely agricultural. Even though they are using the property for feeding of cattle that are sold. Obviously this is commercial. But it is an agricultural commercial usage. And again, that is the issue here. Is Mr. Scherer's usage an agricultural use? If it is, then he should be sent out of the courtroom and found not guilty."

It appears the court felt agricultural uses and all other uses are mutually exclusive; that is, a salvage yard as defined by the Aubry regulations cannot possibly be used agriculturally. The *Blauvelt* case points out the flaw in this interpretation of the statute; a residence, clearly not an agricultural use in most cases, was held to be an agricultural use when a farmer would live in it.

Thus, we believe the trial court erred in not instructing the jury that Scherer's use of his land, even though it found the use to be a salvage yard as defined by the Aubry regulations, was exempt from the regulations if it was also an agricultural use.

Scherer next argues that the trial court's use of the definition of "salvage yard" contained in the Aubry zoning regulations was erroneous. This is simply a continuation of the argument that the

court should have instructed the jury on the agricultural use exemption. The trial court might have cured this shortcoming either with a separate instruction or by modifying the "salvage yard" definition to inform the jury that if Scherer's "salvage yard" was an agricultural use of his property that he should be found not guilty.

Scherer follows this with a complaint that the court erroneously excluded catalogs he offered to try to inform the jury of the agricultural purposes of his machinery. He offered them under the business records and the learned treatise exceptions to the hearsay rule. He asserts in his brief, for the first time, that they should have been admitted under the commercial lists exception. K.S.A. 1985 Supp. 60-460(bb). Hearsay exceptions raised for the first time on appeal need not be considered. *State v. Palmer*, 8 Kan. App. 2d 1, 4-5, 657 P.2d 1130 (1982).

Finally, Scherer complains about the fine imposed by the court.

Scherer was originally charged with willful misdemeanor violations of the 1982 and 1975 Aubry Township zoning regulations for the period from June 1, 1984, through July 10, 1984. On October 2, the complaint was amended to include violation of the 1959 regulations for the same period. Scherer was tried on April 22 to 24, 1985. On April 24, after the completion of the evidence, the assistant district attorney apparently handed the court a second amended complaint which charged Scherer with violations for the period from June 1, 1984, through April 22, 1985, and the court permitted this amendment over Scherer's objection on the ground it was an amendment to conform to the evidence.

The jury found Scherer guilty of violations for the period June 1, 1984, to April 22, 1985. The Aubry regulations provided for a fine of up to $200 per violation and that each day of violation was a separate offense. This penalty is authorized by K.S.A. 19-2912, which states in part:

"That any violation of any provision of this act shall be deemed to be a misdemeanor and punishable by a fine of not to exceed two hundred dollars for each offense and that each day's violation shall constitute a separate offense . . . ."

On June 14, 1985, the trial court sentenced Scherer to pay a fine of $200 per day from June 1, 1984, to the sentencing date and

every day thereafter the violation continues. On the date of sentencing, the court stated the fine totalled $75,600.

As to that portion of the sentence which imposed a fine for each day between the trial and the sentencing and "for each day the violation continues" we conclude "one can be punished only for an offense which he has actually committed, not for an offense which he may commit in the future." 21 Am. Jur. 2d, Criminal Law § 4, p. 117. This rule follows from the long-standing rule of criminal procedure which has been codified at K.S.A. 21-3109: "A defendant is presumed to be innocent until the contrary is proved." Obviously, no evidence of Scherer's violation of the regulation after the date of his trial has been properly offered in a criminal trial against him. Therefore, he cannot be punished for violations alleged to have occurred after the trial until he is convicted of those violations.

We next must determine whether the trial court had jurisdiction of the offenses from July 11, 1984, to April 22, 1985, which were added by the State at the conclusion of the evidence.

There appears to be no question here that the district court would have jurisdiction of all the alleged violations if its jurisdiction had been properly invoked. That is, it has subject matter jurisdiction over criminal misdemeanors. However, the district court must have jurisdiction not only over the offense charged, "[b]ut a court must also have jurisdiction of the question which its judgment assumes to decide." *State v. Minor*, 197 Kan. 296, 299, 301, 416 P.2d 724 (1966). Thus, it has been held that the court had no jurisdiction to convict a defendant of battery because it is not a lesser included offense of an attempted rape charge, even though the defendant himself requested that the trial court give an instruction on battery. *State v. Chatmon*, 234 Kan. 197, 204, 671 P.2d 531 (1983).

The original complaint in this case properly invoked the court's jurisdiction over the offenses from June 1 to July 10. K.S.A. 1985 Supp. 22-3201(4) provides: "The court may permit a complaint or information to be amended at any time before verdict or finding *if no additional or different crime is charged* and if substantial rights of the defendant are not prejudiced." (Emphasis added.) Since each day of violation was a separate offense, the State added approximately 285 offenses by amending the complaint at trial to include offenses for the period from

July 11 to April 22. We conclude that the district court had no jurisdiction over those offenses added by the amended complaint on the last day of the trial. Since the court had no jurisdiction over those offenses, the fine imposed for those days is void. *Chatmon*, 234 Kan. at 205.

Next, did the trial court abuse its discretion when it assessed the maximum fine permitted under K.S.A. 19-2912 and the Aubry regulations for each day of violation?

The general rule where abuse of discretion in sentencing is raised is that "[f]ailure to allege a sentence is outside statutory limits or is the result of partiality, prejudice or corrupt motive presents no issue for review of sentencing on appeal." *State v. Haines*, 238 Kan. 478, Syl. ¶ 1, 712 P.2d 1211 (1986). However, that case and others we have found involve sentences imposing incarceration not fines, as here. When considering fines, in addition to the particular penal statute, we must consider also K.S.A. 21-4607(3) and the Kansas Constitution Bill of Rights, § 9.

K.S.A. 21-4607(3) provides:

"In determining the amount and method of payment of a fine, the court shall take into account the financial resources of the defendant and the nature of the burden that its payment will impose."

In this case, the record contains no indication that Scherer's financial resources were considered by the court in imposing the fine. In fact, the only evidence in the record indicates that his resources may be limited—he lost to foreclosure seventy of the eighty acres he owned in Aubry Township in 1977 or 1978. Given the statutory directive to consider his ability to pay the fine, we believe it was an abuse of discretion not to do so.

Finally, the Kansas Constitution Bill of Rights, § 9 provides in part: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." If we consider the court's fine of $200 per day as applying only to the period of 40 days involved in the original complaint, this would still be $8,000.00. It was recently held that factors considered in determining whether the length of a sentence violates the prohibition against cruel punishment should also be applied to determine whether a fine violates the prohibition against excessive fines. *State v. Gibson*, 8 Kan. App. 2d 135, 138-39, 651 P.2d 949 (1982). These factors were set out in *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978):

"(1) The nature of the offense and the character of the offender.should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense."

How might these factors be applied to the fine imposed in this case? The nature of the offense of violating a zoning ordinance seems to militate against the enormous fine imposed in this case. Scherer's collection of equipment does not seem to pose any danger to society except to aesthetic sensibilities and neighboring property values, at least so long as no one trespasses on his property.

Perhaps the best approach is to compare the seriousness of illegal operation of a "salvage yard" with the seriousness of other illegal uses classified with "salvage yards" under the Aubry regulations. All violations of the regulations are subject to the same penalty of $200 per violation with each day to be a separate offense. "Salvage yards" are classed with twenty-three other uses as conditional uses which require a permit before they can legally exist in Aubry Township. Several of these seem, like salvage yards, to pose little more than an aesthetic threat to the "public health, safety, morals, and general welfare" and the "surrounding property, persons, and neighborhood values." (These are the main factors to be considered in deciding whether to allow a conditional use.) These include cemeteries; contractors' shop, yard, and storage areas; radio and television towers; single mobile home units used for residential purposes; and trailer parks. Others seem to pose a more serious threat largely due to the increased traffic and congestion they would almost certainly cause: athletic and baseball fields, drive-in theatres, exposition centers, fairgrounds, fire stations, greenhouses operated as retail businesses, commercially operated recreational or sports facilities, and riding academies, stables, or show arenas. Another group poses a special hazard due to the presence of animals: keeping various animals on less than two acres, kennels, riding academies, stables, show arenas, commercial

stockyards and feedlots, and zoos. Some are difficult to assess as posing any particular threat: group boarding homes, preschools, nurseries, and day-care centers. And finally, one group stands out as posing the most serious potential problems: airports or landing fields, quarries and asphalt or concrete plants, sanitary landfills or hazardous waste disposal facilities, and commercial stockyards or feedlots. Since all these uses, if pursued without obtaining a permit, are punishable by the same maximum $200 per day fine, it appears that, absent other factors such as prior violations, the relatively less threatening use Scherer made of his land should not be punished by the maximum fine allowable.

Reversed and remanded for new trial.