812 P.2d 1052

**MARICOPA COUNTY, a Political Subdivision, Plaintiff–Appellant,**

v.

**Robert BARKLEY and Jane Doe Barkley, Husband and Wife; Frank H. Estes and Jane Doe Estes, Husband and Wife, Defendants–Appellees.**

**No. 1 CA–CV 89–251.**

Court of Appeals of Arizona, Division 1, Department E.

Dec. 11, 1990.

Review Denied July 16, 1991.

Maricopa County Atty's Office by James R. Minter, Phoenix, and John D. Helm, Helm & Kyle, Ltd., Tempe, for plaintiff-appellant.

Laird & Schneck, P.C. by Jerry Steele, Phoenix, for defendants-appellees.

## OPINION

LANKFORD, Judge.

This appeal is brought by Maricopa County from a judgment of the Yavapai County Superior Court in a condemnation action instituted by Maricopa County.

Maricopa County filed this action in the Superior Court of Maricopa County in 1984. The county sought to condemn about sixty-six acres of land within a larger parcel located in the bed of the Agua Fria River and owned by appellees Barkley and Estes. The county intended to use the land for flood control.

By stipulation and pursuant to A.R.S. § 12–1116, the county deposited approximately $185,000 into court and obtained immediate possession of the property.

Upon motion by Barkley and Estes, and pursuant to A.R.S. § 12–408, venue was moved to Yavapai County.

After a jury trial, the superior court entered judgment on the verdict awarding $1,800,000 to Barkley and Estes as compensation for the taking.

Maricopa County appealed. When the county sought an order staying enforcement of the judgment pending appeal, the superior court required the county to post a supersedeas bond in the amount of $2,000,000 as a condition for granting the stay.

The county raises numerous issues on appeal. It attacks the change of venue, evidentiary rulings at trial, the instructions to the jury, and the order requiring a supersedeas bond.

### I.

■ We first address the county's attack on venue. Initially, we note that appellate courts will not interfere with a venue ruling in the absence of a clear abuse of the trial court's discretion. *Floyd v. Superior Court, Cochise County*, 125 Ariz. 445, 610 P.2d 79 (1980). *See, e.g., Slovenic National Benefit Society v. Ilija Dabevich*, 30 Ariz. 294, 246 P. 765 (1926) (denial of motion for change of venue only reversed for abuse of discretion by trial court). Additionally, "if the error is not jurisdictional, reversal would be rare in view of our constitutional mandate that no cause shall be reversed when substantial justice has been done. Ariz. Const. art. 6, § 27." *Goff v. Superior Courts in and for Counties of Pima and Maricopa*, 2 Ariz.App. 344, 347, 409 P.2d 60, 63 (1965).

The county contends that venue lies in Maricopa County as the county in which the property is located. It relies on A.R.S. § 12–1116, which states:

All actions for condemnation shall be brought as other civil actions in the supe-

rior court of the county in which the property is located.

Barkley and Estes support the change of venue from Maricopa County to Yavapai County, relying on A.R.S. § 12–408, which provides:

In a civil action pending in the superior court in a county where the county is a party, the opposing party is entitled to a change of venue to some other county.

Our task is to reconcile these two statutes. Maricopa County argues that the condemnation venue provision is the more specific statute. Therefore, it contends, the change of venue statute must yield under the doctrine that when two statutes conflict, the more specific one controls. *See Pima County v. Heinfeld*, 134 Ariz. 133, 654 P.2d 281 (1982). The county also relies on *State v. Hollis*, 93 Ariz. 200, 379 P.2d 750 (1963), but that case does not attempt to reconcile these two statutes and merely reiterates the venue rule in A.R.S. § 12–1116.

If possible, statutes must be read harmoniously rather than in such a manner that a conflict results. *See Arizona State Highway Comm'n v. Nelson*, 105 Ariz. 76, 459 P.2d 509 (1969). We believe that these two statutes can be harmonized.

The operation of these statutes is illuminated by the decision in *GAC Properties, Inc. of Arizona v. Farley*, 14 Ariz.App. 156, 481 P.2d 526 (1971). In that case, we construed § 408 in conjunction with property tax appeals statute, A.R.S. § 42–245. We held that the change of venue statute, § 408, applied to property tax appeals. Although the tax appeals statute was arguably "specific," and created a special statutory proceeding to be brought in the superior court of the county in which the property was located, we held that § 408 applied in the absence of any provision in the tax appeals statute to the contrary.

As with the property tax appeals statute, the condemnation statute involved here does not exclude the operation of the change of venue statute. If we are to adhere to the reasoning of *GAC Proper-*

*ties,* we must uphold the change of venue in this case.[1]

■ This result is also supported by the statutory language. Section 1116 provides that condemnation actions "shall be brought" in the county in which the property is located. That this is not a permanently fixed venue is illustrated by a related statute, A.R.S. § 12–401(15), which provides:

> Actions against counties *shall be brought* in the county sued unless there are several counties defendant, when it may be brought in any one of the counties.

(Emphasis added).

The venue selected by § 12–401(15) may be changed pursuant to § 12–408(A). The ability to change venue suggests that the language "shall be brought" means that while the action must be *initiated* in the selected venue, it need not be maintained permanently there. The same phrase— "shall be brought"—appearing in section 1116 thus does not reveal anything more than the legislature's prescription of an initial venue. To hold otherwise would require us to interpret the legislature's use of the identical phrase in two statutes relating to the same general subject matter as having two entirely different meanings.

Section 1116 also provides that condemnation action "shall be brought as other civil actions." The change of venue statute, § 408, applies to "civil action[s]." These statutes are best harmonized by allowing a change of venue in condemnation actions as in other civil actions.

This interpretation is also consistent with the operation of venue statutes generally. Rarely, if ever, does a venue statute fix venue immutably. Venue statutes either create limited venue choices for plaintiffs, or create presumptive venues. *E.g.,* A.R.S. § 12–401. In either case, venue may be changed upon the grounds specified by statute. *E.g.,* A.R.S. §§ 12–406, 408. Section 1116 best fits the general pattern of

venue legislation as a presumptive choice of venue, not as a final, unalterable venue selection. The change of venue statute thus applies to this action because § 1116 mandated a Maricopa County venue only as an initial venue selection. The change of venue from Maricopa County to Yavapai County does not constitute reversible error.

## II.

■ The county next contends that the superior court erred in requiring a supersedeas bond as a condition of staying the enforcement of the judgment. According to the county, Rule 62(g), Arizona Rules of Procedure, exempts it from the bond requirement. Rule 62(g) provides:

> When an appeal is taken by the state or an officer or agency thereof or by direction of any department of the state and the operation or enforcement of the judgment is stayed, no bond, obligation, or other security shall be required from the appellant.

As state agencies, the county contends, the bond exemption of Rule 62(g) applies to counties. We agree. *See Navajo County v. Superior Court,* 105 Ariz. 156, 461 P.2d 77, *opinion on denial of rehearing,* 105 Ariz. 248, 462 P.2d 797 (1969).

In response, Barkley and Estes point out that the county already has possession of the land and argue that they are entitled to immediate payment under A.R.S. § 12–1127. This statute requires the county to pay the judgment if it retains possession, they argue.

The county has already obtained and filed the bond. The county asks for no particular relief on appeal, and merely asserts that requiring the bond was error. A petition for special action to this court would have afforded effective relief from an order improperly fixing supersedeas. *See, e.g., Hackin v. Superior Court,* 102 Ariz. 93, 425 P.2d 420 (1967) (challenge of refusal to issue stay order); *Allison v.*

---

**1.** Although the tax appeals statute involved in *GAC Properties* used the words "may appeal" and condemnation statute uses the words "shall be brought," in our opinion "may" as used in former §§ 42–245.01 and 245A.1 referred to the permissive nature of the tax *appeal,* and not to the choice of *venue* for the appeal.

*Chatwin,* 99 Ariz. 99, 407 P.2d 69 (1965) (challenge of excessive bond amount). Moreover, a stay pursuant to Rule 62(g) is automatic. *Navajo County, supra.* Thus, if the county is correct that Rule 62(g) applies, then the proper course was not for the county to seek a special stay order from the superior court which that court could condition upon the posting of a bond, but instead to rely on the automatic character of the stay. In summary, the county seeks no particular relief, and we therefore grant none on this issue.

### III.

■ The county next challenges the admission of testimony by several witnesses on the issue of valuation of the property. The property involved in this case was used as a sand and gravel mine. The county concedes that the witnesses were experienced in the sand and gravel business, but argues that business experience alone cannot qualify them to testify as experts on the value of a sand and gravel property. In a related argument, the county contends that these witnesses were not qualified to testify as to the value of the property as determined from the value of the sand and gravel resources located upon it.

The overarching rule which guides our review of the trial court's decision of the qualifications of the witnesses as experts is that the determination of this matter is left to the discretion of the trial court. *Godwin v. Farmers Ins. Co.,* 129 Ariz. 416, 631 P.2d 571 (App.1981). A witness may be qualified to give an opinion by reason of his "real world" experience as well as by academic study. *Id.* at 420, 631 P.2d at 575. The standard is whether the witness has "specialized knowledge [which] will assist the trier of fact ..." Rule 702, Arizona Rules of Evidence. In particular, a witness who is not a certified appraiser may give valuation evidence in a condemnation case. *See State v. McDonald,* 88 Ariz. 1, 352 P.2d 343 (1960) (accountant permitted to testify as to value in condemnation action).

In this case, the witnesses had extensive experience in the sand and gravel business. Their experience included familiarity with sand and gravel operations on and in the vicinity of the condemned parcel and the previous evaluations of sand and gravel properties for possible purchase. We hold that the trial court did not abuse its discretion in permitting these witnesses to give opinions of value.

■ Nor was it error to permit the witnesses to testify on the value of the property based on the income which could be generated by the resources contained upon it. This is known as the "capitalization" method of property valuation. All of the witnesses were familiar with the subject property, the quantity of materials within it, and the market value of the sand and gravel which could be extracted from it.

Although the county contends that an expert appraiser was needed to testify on the capitalization method, we disagree that the title "appraiser" is required to qualify these witnesses as experts. *See State v. McDonald, supra.* The trial court had adequate grounds for allowing these witnesses to testify as experts.

The county also argues that a proper capitalization appraisal requires the witness to take into account numerous factors. In turn, it argues, the need to consider these factors requires testimony from a professional appraiser. There is indeed some authority for this proposition. *See State v. Nunes,* 233 Or. 547, 379 P.2d 579 (1963). However, there is also persuasive authority for the contrary proposition that a mineral expert other than a professional appraiser may testify concerning mineral royalty capitalization. *See United States v. 2,847.58 Acres of Land,* 529 F.2d 682 (6th Cir.1976) (geologist and petroleum engineer); *Cloverport Sand & Gravel Co. v. United States,* 6 Cl.Ct. 178 (1984) (sand and gravel operator).

■ Again, the qualification of a witness to testify on this subject is within the trial court's sound discretion. If these witnesses failed to make a thorough and complete capitalization valuation according to the standard methodology of professional appraisers, then that failure went to the weight of their opinions rather than to ad-

missibility. The county was entitled both to call professional appraisers as witnesses in rebuttal and to cross-examine the condemnee's experts. Any resulting conflict was for the jury to resolve.

■ Moreover, our review of the testimony reveals that the witnesses did account for the very factors which the county contends only an expert appraiser can adequately consider. For example, the county contends that the valuations did not account for the costs of removing the sand and gravel. However, the testimony did not disregard costs by resting the opinions of property value on the gross value of the resources. Instead, the witnesses relied on the royalties which a landowner would receive from a purchaser of the right to extract the resources *at the purchaser's expense,* which is a net valuation. *See United States v. 2,847.58 Acres,* 529 F.2d at 685. We find no error in the trial court's exercise of its discretion to admit this evidence. *See generally Falcher v. St. Luke's Hospital Medical Center,* 19 Ariz. App. 247, 506 P.2d 287 (1973) (admission or rejection of evidence is within trial court's discretion and is reversible only for clear abuse of discretion).

■ The county's final challenge to the valuation witnesses is that one of the witnesses had a financial interest in the outcome of the condemnation litigation, and therefore should not have been permitted to testify. The bias or interest of a witness is a matter that affects credibility and thus goes to weight, rather than to admissibility. *See Cottonwood Estates v. Paradise Builders,* 128 Ariz. 99, 624 P.2d 296 (1981) (attorney subject to impeachment based on interest in outcome of litigation).

We find no abuse of discretion in the trial court's decision to permit these witnesses to give opinion testimony.

## IV.

The county next argues that the superior court should have excluded certain valuation testimony on substantive grounds. The county attacks two types of evidence: first, evidence valuing the property by the "multiplier" method, and second, evidence of the "rental value" of the property.

We turn first to the county's challenge of the multiplier method. The multiplier method is a particular form of the capitalization approach to valuation. Thus, the county's argument is a variation of its attack on valuation by the capitalization method.

As applied to this case, the multiplier method consists essentially of multiplying the estimated quantity of material to be mined from the property by the market price per unit of quantity. The county contends that this method is too simplistic and speculative to aid the jury as a measure of value. Among other things, the county argues that the multiplier method is inaccurate unless factors such as the costs of extraction and the uncertainty of future market prices are considered.

The courts are divided on whether evidence of this type is admissible and upon what conditions it is admissible. Some courts hold that multiplier capitalization evidence is always inadmissible; others hold that this method may be used to arrive at an estimate of land value, but that the witness may not testify directly on the multiplication of quantity of materials and unit price; still other courts hold that the method may be used and is a proper subject of testimony. 5 Nichols, *The Law of Eminent Domain* ¶ 19.06[4], p. 19–48 (rev. 3d ed. 1990).

Our consideration of this issue begins with the basic principle that a condemnee is entitled to just compensation. The objective of just compensation is met by payment of fair market value, the price at which a willing seller will sell to a willing buyer. *Stockholders and Spouses of Carioca Co. v. Superior Court,* 141 Ariz. 506, 687 P.2d 1261 (1984). Just compensation has never been reduced to a single formula; rather than a general formula, various ways of valuing property are appropriate depending on the circumstances. *United States v. Cors,* 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); *United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

Market value is not an amount susceptible to exact calculation by use of fixed numbers. Rather, value is invariably a matter of opinion and estimation. The opinion may be based on a number of methods of valuation. Perhaps the most frequently used method, and arguably the preferred method, is that which estimates market value based on sales of property comparable to the condemned property. *See Cloverport Sand & Gravel*, 6 Cl.Ct. at 189 (most frequent; "best evidence of value"); *United States v. 103.38 Acres of Land, More or Less, Etc.*, 660 F.2d 208 (6th Cir. 1981) (preferred method).

Comparable sales are not always available, however. For example, there are undoubtedly few sand and gravel pits compared to office buildings and other types of property, and sales of sand and gravel mines may be infrequent. In fact, the evidence in this case suggests that sales of sand and gravel pits are very infrequent.

■ When meaningfully comparable sales are not readily available, other methods of valuation must be used. *See United States v. 22.80 Acres of Land in San Benito County*, 839 F.2d 1362 (9th Cir.1988). *See also Cloverport Sand & Gravel*, 6 Cl.Ct. at 189 (when no comparable sales available, value based on capitalization method is "the next best approach").

■ When the condemned property is being used to extract raw materials from the land, one reasonable method of estimating the property's value is to consider the future income that can be obtained by mining the materials. While it might be improper to assess compensation solely upon the income value of the land, or upon the value of resources contained within it, these are clearly elements which may properly be considered by an expert in rendering an opinion of value, or by a jury in awarding compensation. *See Nichols, supra* at p. 19–48, 49. *See also Stockholders*, 141 Ariz. at 509, 687 P.2d at 1264 (rental income is a proper element to consider when valuing property).

The expert testimony in this case consisted of opinions of the market value of the property, supported by the capitalization methodology. The testimony did not merely establish the value of the raw materials alone.

■ Although the capitalization method may have its pitfalls and its flaws, valuation is inherently imperfect and inexact regardless of the method used. To be sure, multiplication of the raw materials and the current market price of those materials may be too simplistic to yield an accurate valuation. However, we need not decide whether failure to account for other relevant factors, such as the costs of extraction, renders the evidence inadmissible as opposed to merely of lesser weight. The evidence in this case did account for other factors, and thus overcomes the county's objection that the evidence is purely speculative.

The evidence here directly or indirectly reflected consideration of the costs of extraction, the uncertainty in price caused by market fluctuations, and the reduced value of materials to be extracted far in the future. The witnesses did not merely multiply the quantity of materials by the current market price per quantity unit. Instead of using the market prices for sand and gravel that had already been removed from the ground, they used royalty prices. The royalty is the amount that a buyer would pay the landowner for the right to remove the materials, with the buyer bearing the expense of extraction. A royalty figure thus by its nature accounts for the cost factor which the county contends must be considered in using the multiplier method. *See United States v. 2,847.58 Acres, supra.* Moreover, witnesses for the condemnee also testified that the analysis employed in reaching their opinions considered time and risk factors, and they specifically cited the historical trend in market prices for the materials.

The testimony illustrates how use of royalty figures adjusted the value from what the county argues is the inaccurate amount obtained by merely multiplying quantity and price. Three witnesses testified consistently with one another that the royalty income from the materials would be $100,-

000 per acre if they were extracted and sold at current prices. However, relying in part upon the royalty method, the witnesses estimated the value of the property as $42,000 per acre, between $40,000 and $50,000 per acre, and between $35,000 and $40,000 per acre. In addition, the jury's verdict reflects an award of only about $20,000 per acre, excluding severance damages to a portion of the parcel not condemned.

In allowing the multiplier method as evidence of market value, we follow the majority of courts. See cases cited in *State v. Nunes*, 233 Or. 547, 379 P.2d 579, 582 nn. 3–5 (1963).[2] Indeed, one court has praised the royalty capitalization method as the "most reliable" approach for valuing a sand and gravel property when comparable sales are unavailable. *Cloverport Sand & Gravel Co. v. United States*, 6 Cl.Ct. at 196 (1984).

We turn now to the county's contention that evidence of "rental" income was improperly admitted. The "rental" to which the county refers is apparently the royalty income discussed above. We have determined that royalty evidence is admissible. Moreover, even if the royalty income were properly characterized as "rental" income, the trial court had the discretion to admit this evidence. Our supreme court has held: "Rental income produced by the property will affect the price a willing buyer would pay and a willing seller would accept, and therefore is a proper element to consider when valuing property." *Stockholders*, 141 Ariz. at 509, 687 P.2d at 1264.

The superior court did not abuse its discretion by admitting this evidence.

## V.

The county contends that the trial court erred in permitting the jury to consider the value of the property for sand and gravel extraction because that was an illegal use. According to the county, the sand and gravel operation violated floodplain regulations and mining law. In a related argument, the county asserts that the condemnee's witnesses testified as to the quantity of sand and gravel without regard to regulatory limits on the depth of excavation. Furthermore, the county argues, the court improperly allowed the jury to decide the legal question whether the mining operation was a lawful non-conforming use exempt from floodplain regulations, and the court erroneously instructed the jury on non-conforming uses.

■ We begin with the basic proposition that "the landowner is entitled to have the fact finder determine the fair market value of the land taken by reference to the land's highest and best use, together with all other factors of value which would tend to influence the property's value." *Cloverport Sand & Gravel*, 6 Cl.Ct. at 188. We agree with the county that this proposition is qualified by the rule that an illegal use does not qualify as a "highest and best use" which may be considered in valuing the property. *Gear v. City of Phoenix*, 93 Ariz. 260, 379 P.2d 972 (1963).

The county argues that prior mining operations were illegal because the owners did not notify the state of the commencement of mining operations as required by statute.[3] The owners do not contend that they gave the required notice.

The legality of the prior use is, as the county contends, a question of law for the court. The trial judge did not instruct the jury on this question. However, he admitted evidence of value based on mining income and instructed the jury regarding nonconforming use. It thus appears that the judge decided that the failure to give the required notice did not render the prior

---

2. We nevertheless disagree with the conclusion in *State v. Nunes*, 379 P.2d at 585, that only an expert appraiser may utilize this method of valuing property. See discussion, *supra*.

3. The notification statute in effect just prior to adoption of the floodplain regulations was former A.R.S. § 27–303, which provided:

> When mining operations are commenced in any mine or when operations therein are permanently suspended, the operator shall give written notice to the [state mining] inspector at his office prior to commencement or suspension of operations.

The current version of this statute is essentially similar.

use unlawful. We review this determination of law *de novo*.[4]

The right to a nonconforming use exception to the flood control regulations is established by A.R.S. § 48–3609(H), which provides in part as follows:

Unless expressly provided, this article and any regulations adopted pursuant to this article do not affect:

1. Existing legal uses of property or the right to continuation of such legal use.

The Legislature did not define a "legal" use. Adherence to the Legislature's intention is the cardinal rule in finding the meaning of this or any other statute. *Calvert v. Farmers Ins. Co. of Arizona*, 144 Ariz. 291, 697 P.2d 684 (1985).

This court has previously considered and determined the legislative purpose of a prior version of this provision. "The purpose of exemptions for existing uses is to avoid the injustice and doubtful constitutionality of immediately eliminating existing uses." *Pima County v. Cardi*, 123 Ariz. 424, 426, 600 P.2d 37, 39 (App.1979). On the other hand, there is no indication that the Legislature intended the floodplain regulations to be devices for the enforcement of other laws, such as the mining law involved here. *See Scavone v. Totowa*, 49 N.J.Super. 423, 426, 140 A.2d 238, 240 (1958).

The essential question, then, is whether justice is better served by regarding the failure to give the notice as disqualifying the prior use as "legal" for purposes of floodplain regulations. No Arizona appellate court has yet decided this question.

The courts of other states have confronted a similar question in the context of zoning regulations, but have not reached a single answer. When the alleged illegality is the failure to obtain a license unrelated to zoning regulations, the courts frequently recognize a lawful non-conforming use despite the lack of the license. The authors of one treatise observed:

The courts have divided on the question of whether a use established in violation of other ordinances should be recognized as a valid nonconforming use. Most decisions have said no. However, where the violation was merely a failure to obtain a license, which could be had either for the asking or with the correction of some minor violations, some courts have held that this does not preclude the owner from obtaining nonconforming status.

4A N. Williams & J. Taylor, *American Planning Law: Land Use and the Police Power* § 110.02, p. 90–91 (rev. ed. 1986).

Many courts adhere to the view that the lack of a license does not render the use unlawful. *See, e.g., Carroll v. Hurst*, 103 Ill.App.3d 984, 59 Ill.Dec. 587, 431 N.E.2d 1344 (1982) (junkyard); *Trailer City, Inc. v. Board of Adjustment*, 218 N.W.2d 645 (Iowa 1974) (mobile home park); *Board of Selectmen of Wrentham v. Monson*, 355 Mass. 715, 247 N.E.2d 364 (1969) (same); *Drysdale v. Beachnau*, 359 Mich. 152, 101 N.W.2d 346 (1960) (garbage dump); *Scavone v. Totowa*, *supra* (automobile sales lot); *Henning v. Goldman*, 8 Misc.2d 228, 169 N.Y.S.2d 817 (1957) (parking lot); *City of Franklin v. Gerovac*, 55 Wis.2d 51, 197 N.W.2d 772 (1972) (salvage yard).

We think that this is the better view in the circumstances of this case. The purpose of the notice under the mining laws is to facilitate safety inspections. *See* current A.R.S. § 27–303(C). The purpose of the notice statute is thus unrelated to flood control or land use regulation. When there is no relationship between the alleged illegality and the zoning regulations, an exemption based on prior nonconforming use may be recognized. *See Carroll v. Hurst*, 103 Ill.App.3d at 989, 59 Ill.Dec. at

---

4. In its reply brief, the county adds that it was error to fail to instruct the jury that valuation cannot be based on an illegal use. Any argument about the failure to so instruct the jury has been waived. A new argument may not be raised in a reply brief. *See Wasserman v. Low*, 143 Ariz. 4, 691 P.2d 716 (App.1984); Rule 13(c), ARCAP. Nor may the refusal to give an instruction be attacked unless the appellant provides the text of the proposed instruction to the reviewing court. *See* Rule 13(d)(1), ARCAP. The county raised this issue in its reply brief and failed to provide the text of a proposed instruction, if in fact it did propose an instruction below. We will therefore not decide the point.

591, 431 N.E.2d at 1348. The operation of a mine on this property was not at any time a prohibited use; the mining laws merely regulated that use by requiring notice. *See City of Franklin v. Gerovac,* 55 Wis.2d at 55, 197 N.W.2d at 774. In short, the public policy served by zoning regulations is not undermined by recognizing the exemption from the regulations.

We also find it important that there is no apparent reason why the owners could not easily bring themselves into compliance merely by giving the required notice. *See Drysdale v. Beachnau, supra; Board of Selectmen of Wrentham v. Monson, supra.* Even if the prior failure to give notice tainted the mining operation, the county does not argue that the owners could not comply simply by giving notice now, permitting future extraction. It is the value of the future use of the property as a sand and gravel operation that is important in assessing just compensation.

Furthermore, the state mine inspector has no statutory authority to close a mining operation which has failed to comply with the notice statute.[5] The owner's failure to give the required notice constituted a misdemeanor.[6] Thus, a mining operation apparently may continue even if the operator has violated § 27–303. *See Henning v. Goldman,* 169 N.Y.S.2d at 819 (violation of license ordinance invokes penalties under that ordinance but does not alter character or use of premises). The evidence also fails to reveal any safety problems in the operation of the sand and gravel pit. The county does not contend that the mine is a safety hazard or a public nuisance. *Cf. Scavone v. Totowa,* 49 N.J.Super. at 427, 140 A.2d at 240 (noting absence of any question that nonconforming use would be a nuisance).

We also note that the condemned property had been used as a sand and gravel mine for many years. The record does not reveal any prosecution of these owners for violation of any mining laws. *See City of*

*Franklin v. Gerovac, supra* (prior nonenforcement a factor in upholding nonconforming use).

Moreover, given that the property lies within a floodplain, it is doubtful that the land has much value other than for sand and gravel extraction. The constitutional guarantees of just compensation are implicated when prior nonconforming uses are rendered unlawful by new zoning laws and the new laws "render ... valueless substantial improvements or businesses built up over the years ..." *Henning v. Goldman,* 8 Misc.2d at 228, 169 N.Y.S.2d at 819. The legislative purpose of avoiding action of doubtful constitutional validity, *see Pima County v. Cardi, supra,* is served in this case by recognizing that sand and gravel mining is a prior nonconforming use.

We therefore hold that the Legislature's purposes in recognizing prior legal uses are best served by upholding the superior court's determination that mining was a legal use. In doing so, we rely on the particular circumstances of this case, as described above and summarized as follows:

1. The object of the mining statute is unrelated to land use, and in particular is unrelated to flood control;

2. It is not the use of the land as a mine that is prohibited, but the failure to give the notice;

3. The owners conceivably could correct the violation merely by giving the required notice;

4. The mining laws do not authorize closure of the mine for failure to give the notice, but instead impose a monetary penalty;

5. The record fails to reveal any unsafe mining practices;

6. The record fails to show any prior enforcement of the mining laws against the owners; and

7. The property's value for condemnation purposes could be greatly diminished if

---

5. Such authority exists only if the inspector finds safety violations which remain uncorrected after notice to the mine operator. A.R.S. § 27–307(C).

6. Under former A.R.S. § 27–302(C), the violation was a misdemeanor punishable by a fine of from fifty to three hundred dollars. Under the current version, the violation is a petty offense.

the jury could not consider its value as a mine.

■ We also reject the county's argument that the issue of non-conforming use is one purely of law which must be reserved to the judge and cannot be submitted to the jury. Whether there was a permissible non-conforming use depended on two matters: (1) whether the property owners extracted sand and gravel prior to adoption of the floodplain regulations; and (2) whether that use was legal. The first issue was one of fact suitable for determination by the jury. The trial court instructed the jury as follows:

> If you find that sand and gravel excavation was being performed prior to the adoption of the flood control regulations and [that] excavation continued until Maricopa County took control of the property in 1984, then the flood control regulations do not apply and you are to determine the just compensation without any flood control regulation limitation.

■ We find no error in this instruction nor in the submission of this issue to the jury. The judge did not submit any questions of law to the jury. He decided whether the use was lawful and instructed the jury regarding the effect of a non-conforming use on valuation. While the county contends that the only issue for a jury in a condemnation case is value,[7] identifying the highest and best use of the property is part of the valuation process. The questions whether the property was used for mining prior to the adoption of regulations restricting that use, and the property's value with such a use in mind, are fact issues which may be submitted to the jury along with any other subsidiary fact questions relating to value.

The county further argues that the condemnee's witnesses did not take into account limitations on the size and depth of extraction imposed by the floodplain regu-

lations. The county does not inform us of the depth limits created by the regulations. The transcript of the testimony reveals that every witness for the condemnee testified that his calculations used a depth less than the actual depth of the materials in arriving at his evaluation. While these witnesses agreed that the actual depth was 100 feet, the four witnesses used excavating depths of thirty, forty, fifty and seventy feet respectively. In addition, the trial judge properly may have determined that, under the circumstances presented here, any failure to account for limitations on excavation affected weight and not admissibility. *Cf. Cloverport Sand & Gravel, supra* (court considered testimony both with and without acknowledgment by witnesses of excavation limits imposed by need to maintain supporting banks). An erroneous assumption by a witness concerning the maximum depth of excavation was a proper subject of cross-examination, rebuttal evidence and argument by the county. We find no error in the trial court's rulings on this issue.

## VI.

■ The county's next contention is that the trial court erred in failing to instruct the jury that diminution in property value caused by the exercise of the police power is not compensable. The county's contention is that the property should be valued as subject to the flood control regulations, which limit use of the property and thereby diminish its value. The county also alleges that the trial court instead erroneously instructed the jury that regulations which restrict use may nevertheless be disregarded in computing value if the regulations were "steps taken by the county on carrying out a plan."

The challenged instruction states:

> a taking rather than an exercise of the government's police powers. While we agree that whether a taking occurred is a matter of law, the issue here is not whether a taking occurred, but the highest and best use of the land, which is a valuation question.

7. The case upon which the county relies is distinguishable. In *City of Phoenix v. Wade,* 5 Ariz.App. 505, 428 P.2d 450 (1967), this court held that whether street improvements caused a material impairment of a landowner's access was a question of law. The issue was whether the impairment was so severe that it constituted

Just compensation is defined as valuing the property in such a way as not to diminish its value because of steps taken by the county in carrying out a plan. Property cannot be charged with a lesser value at the time of taking when the decrease in value is occasioned by reason of the taking itself. If the proposed improvement depreciates the value of the property it would be unjust that the condemning authority should get it at its depreciated value. The value should be estimated irrespective of any effect produced by the proposed work.

An instruction which misleads the jury regarding the applicable law to the prejudice of a party is reversible error. *Noland v. Wootan*, 102 Ariz. 192, 427 P.2d 143 (1967). The county contends that this part of the instruction misled the jury. The jury might have thought, the county argues, that the flood control regulations were part of a "plan" and therefore that the property should be valued without regard to the regulatory limitations on use of the property. Thus, even if the jurors were to find that the floodplain regulations were applicable, they might ignore the effect of the regulations on the value of the property because the regulations, like the condemnation, were part of an overall "plan" of flood control.

Barkley and Estes defend the instruction on the basis that the county did indeed have an overall plan of flood control, of which both the regulations and the taking were parts. They argue that the just compensation principle bars reducing the value of the property by adopting regulations intended to achieve the same flood control purpose as the taking.

We agree with the county on this issue. The owners cite no authority which speaks directly to the question. The cases cited hold only that diminution in market value prior to the actual taking, and due to either the anticipation of the taking or preliminary steps toward it, may not be used to reduce the landowner's compensation. *State v. Hollis*, 93 Ariz. 200, 379 P.2d 750 (1963); *Robles v. City of Tucson*, 16 Ariz. App. 100, 491 P.2d 489 (1972). The evidence does not support a claim that the floodplain regulations were preliminary steps to the taking of this parcel, and appellees so conceded at oral argument. Instead, these were generally applicable regulations which apparently included property which has not been condemned. Indeed, if all floodplain property were condemned for public use, there would be no need for regulations controlling private use.

Nor is there any evidence of an intentional effort by the county to suppress the market value of the property. While a condemning authority surely may not limit its constitutional responsibility to make just compensation by subjecting the condemned property to regulations impairing its use with the object of reducing its value, there is no evidence of such bad faith by the county which would support the instruction given.

We have considered the county's remaining contentions and find them to be without merit.

Because the superior court erroneously instructed the jury on this matter, we must reverse the judgment of the superior court and remand for a new trial.

FIDEL, P.J., and McGREGOR, J., concur.