IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,844

STATE OF KANSAS,
*Appellee*,

v.

ROBERT EDWARD SMITH,
*Appellant*.

SYLLABUS BY THE COURT

1.

In assessing whether a delay before trial violates a defendant's constitutional right to speedy trial, courts typically consider four factors: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of the speedy trial right; and (4) prejudice to the defendant. But if the length of delay is not presumptively prejudicial, courts do not consider the remaining three factors.

2.

In assessing presumptive prejudice, the passage of time alone is not dispositive. Instead, courts must consider whether the delay is reasonable given the complexity of the case in light of the case's peculiar circumstances.

3.

To preserve for appeal an objection to a district court's ruling that a party may not present a particular theory of defense to the jury, the accused need not lay out their exact strategy so long as they explain their theory with reasonable clarity, and show the court sufficient evidence they intend to present in good faith support of that theory.

4.

In excluding evidence, a district court violates a criminal defendant's fundamental right to a fair trial if the court excludes relevant, admissible, and noncumulative evidence that is an integral part of the theory of the defense.

5.

K.S.A. 22-3201(e) states that the court may permit a complaint or information to be amended at any time before a verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced. A two-part analysis determines whether an amendment prior to submission of the case to the jury may be permitted: (1) Does the amendment charge an additional or different crime? (2) Are the substantial rights of the defendant prejudiced by the amendment?

6.

When a defendant challenges their criminal history score at sentencing, the State bears the burden of proving that score by a preponderance of the evidence. In the face of such a challenge, the presentence investigation report is no longer sufficient to carry the State's evidentiary burden.

7.

K.S.A. 21-6810(d)(9) provides that a prior conviction of a crime defined by a statute that has since been determined unconstitutional by an appellate court shall not be used for criminal history scoring purposes. Under the plain language of this subsection, it is irrelevant whether a subsequent appellate court reversed or repudiated an appellate court's holding that a statute is unconstitutional.

Appeal from Sedgwick District Court; JEFFREY L. SYRIOS, judge. Oral argument held October 29, 2024. Opinion filed February 14, 2025. Convictions affirmed, sentence vacated, and case remanded with directions.

*Lindsay N. Kornegay*, of Kansas Appellate Defender Office, argued the cause, and *Samuel D. Schirer*, of the same office, was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: Following a mistrial and subsequent retrial, Robert Edward Smith directly appeals his convictions for first-degree felony murder, aggravated burglary, attempted aggravated robbery, two counts of aggravated assault, and criminal possession of a weapon, which arose out of the 2016 home invasion and murder of Donna O'Neal. Smith claims he was deprived of his constitutional right to speedy trial; he also alleges prosecutorial error, two violations of his right to present a defense, an error in the district court's decision permitting the State to file a mid-trial amendment to its information, and cumulative error. Smith also claims that he is serving an illegal sentence because the district court erroneously counted a 2003 criminal threat conviction as a person felony. We affirm Smith's convictions but vacate his sentence and remand for resentencing.

## FACTS AND PROCEDURAL HISTORY

In 2016, Donna O'Neal was working as a cook at the Sedgwick County Jail. Steven King worked with her there; he also knew that Donna sold marijuana on the side. Donna and King both knew Smith: King, from when they shared a cell together, and Donna because Smith and his girlfriend, Nakia Johnson, lived in the same apartment complex up until the summer of 2016. King also lived in that apartment complex for about three months, up until the end of July 2016, when he was staying with his friend Gary Black.

3

On the evening of October 8, 2016, Donna met with her son, Clifford O'Neal, and her friend, Yeni Seleno, at her apartment in Wichita. The three planned to go out on the town. But as they were getting ready for the evening, an armed man kicked in the front door and demanded money and drugs. According to Seleno and Clifford, Donna acted like she knew the man. Clifford got on the ground, as the man commanded, but Donna charged the intruder and started wrestling him as he was "trying to get in [Donna's] pockets"; Seleno "immediately" fled the apartment. According to Clifford—who remained on the ground throughout—the ensuing struggle lasted "a couple minutes," and ended when the intruder shot Donna multiple times. The intruder then fled the apartment.

Seleno and Clifford reunited and called 911 at 9:18 p.m. Donna died shortly thereafter, having been shot three times by a .25 caliber weapon.

Police had little to go on, at first. Investigators located no useful surveillance footage from the area around the apartments, and Seleno's and Clifford's descriptions were relatively generic. Seleno said the intruder was "a mid-thirties-aged black male" of "average height and average weight"; at trial, all she could say was that he was "not old." Clifford described the attacker as a bald Black man of about 200 pounds, whom he had never seen before.

The next morning, King learned of Donna's murder at work. King went to the police to report that, several months before, Smith had proposed that the two of them rob Donna. King wanted no part of the plan and warned Donna about it. Indeed, on June 30, 2016, Donna had sent Smith text messages that suggested she knew about the plan; Smith apparently did not respond to Donna's messages.

4

After King provided this lead, the investigation focused on Smith. Smith's cell phone data suggested that he was near Donna's apartment complex minutes after the shooting before gradually moving towards the apartment Smith shared with Johnson.

Johnson had gone to her sister's house earlier in the evening of October 8; Smith was at their apartment when she returned at about 10 p.m. Because Smith and Johnson's relationship had been rocky in recent months, they did not say much to each other; nevertheless, Johnson believed Smith was acting normally. Smith slept at their apartment that night and stayed there until about 5 p.m. on October 9.

On the evening of October 9, Smith called his friend and fishing companion Edward McDaniel. McDaniel picked Smith up, let him stay the night at his place, and then drove him to Kansas City on October 10. McDaniel described Smith as oddly quiet at the time, in contrast to their previous encounters. Cell tower data suggests that Smith's phone arrived in Kansas City at least around noon on October 10.

Investigators searched Johnson's sister's house for Smith on October 9, telling her that they believed Smith had shot someone. Johnson's sister called Johnson to complain about the search.

After police searched Johnson's sister's house, Smith called Johnson several times to apologize, indicate that he had messed up, and state that he needed to turn himself in to the police—though he did not provide details. During one of these conversations, Johnson asked Smith what he had done; Smith only responded that he "fucked up" and would turn himself in. Johnson told Smith "they said that you shot somebody," and Smith responded, "I fucked up, I fucked up, I'm sorry." During another call, Smith accused Johnson of being with the police and trying to set him up; Johnson expressed that she was

trying to get Smith to understand what the police said he had done, and asked why he kept calling her when there was nothing she could do.

Much later, investigators tested shell casings, Donna's fingernails, and Donna's clothing for DNA. Investigators could not exclude Smith as a partial contributor to a sample taken from Donna's shirt collar, with a 1-in-90 chance that the profile was from a random, non-related person. Further, Smith's DNA could not be excluded from a sample taken from Donna's pants pocket, with a 1-in-118,000 probability that the sample belonged to a random unrelated person. At every sampled site where DNA was reportable for comparison purposes, King was excluded as a contributor.

The State ultimately charged Smith with one count of felony murder, one count of aggravated burglary, one count of attempted aggravated robbery, two counts of aggravated assault, and one count of criminal possession of a weapon by a convicted felon. Because of the parties' extensive pretrial litigation and the COVID-19 pandemic, the case did not go to jury trial until July 12, 2021. King testified at this trial. The jury was unable to reach a verdict, however, and the district court declared a mistrial.

The State conducted DNA testing after the mistrial. Between the parties' litigation around this evidence and the COVID-19 pandemic, Smith's retrial was delayed to May 8, 2023. King died of natural causes in the interim; his testimony at the first trial was read to the retrial jury over the defense's objection. The jury ultimately convicted Smith of all charges.

Smith objected to his criminal history at sentencing. Smith argued that his 2003 criminal threat conviction should not be counted as a person felony, based on *State v. Boettger*, 310 Kan. 800, 450 P.3d 805 (2019). The district court overruled Smith's objection, reasoning that the United States Supreme Court's recent decision in

6

*Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023), controlled.

Smith directly appeals.

ANALYSIS

*The 21-month delay between Smith's initial trial and his retrial did not violate Smith's Sixth Amendment right to speedy trial.*

Smith first claims that the 21.5-month delay between his initial trial and his retrial violated his Sixth Amendment right to speedy trial. He makes no similar claim as to the delay before his first trial, however.

Smith raised this claim below, preserving it for appellate review. "As a matter of law, appellate courts have unlimited review when deciding if the State has violated a defendant's constitutional right to a speedy trial." *State v. Shockley*, 314 Kan. 46, 61, 494 P.3d 832 (2021).

*Additional facts*

Smith's first trial began on July 12, 2021, over four and a half years after the initial charge. As part of Smith's defense, defense counsel argued that the State failed to present any DNA evidence tying Smith to the crime. The district court declared a mistrial on July 19, 2021, after the jury failed to reach a unanimous decision.

At a status conference on August 4, 2021, the district court noted that "the State has submitted a request for additional evidence, DNA, possibly cell phone records or cell

7

phone testimony" and that defense counsel "may pursue BIDS request for expert services on the cell phone matters." The court scheduled Smith's second trial to begin on January 24, 2022. A month after the status conference, the court granted the State's motion to obtain saliva samples from Smith to compare his DNA with DNA found on Donna's shirt and pants, although defense counsel indicated Smith would likely seek an independent evaluation of the DNA if the results suggested a match.

On January 7, 2022, the court heard the State's motion to endorse Steven Hoofer as a witness. Hoofer was a forensic examiner that would be drafting a report regarding Smith's DNA, although, at the time of the hearing, the DNA results were not complete. Defense counsel explained Smith "very well may need to talk to the Court about additional time for a defense expert, if that is needed." The court observed the trial, which was scheduled to begin in 17 days, was "coming up pretty quickly" and that counsel had previously "talked about maybe the need to get a continuance after you see that to seek expert advice or opinion or so forth." Further, the court suggested that, because of the still unfinished DNA report, the trial date might need to be pushed out: even if the report was completed before the January 2022 trial date, "I suspect the defense is going to need[] adequate time to respond to it." Defense counsel partially agreed, noting that if the results were inculpatory then "we probably would need to have it looked at," but if the results excluded Smith, then they would be ready for trial.

On January 20, 2022, four days before the trial was scheduled to begin, the court held a hearing on whether the defense was requesting a continuance. The State explained the delays in testing:

"We tried this case back in January—excuse me—July of 2021. After that the State did proceed with some DNA testing. It took a little bit because of the number of comparisons we had to obtain, including the EMS personnel that were in contact with the

8

victim at the time of her death. Those results were emailed to [defense counsel] last Friday."

In order "to at least have an independent review conducted," defense counsel planned to reach out to BIDS to see who would be available for testing—though he noted that BIDS was backed up due to COVID-19, so it was unclear how long it might take. The court asked Smith himself if he was requesting a continuance of the jury trial, and he said he was. The court granted the continuance and scheduled a hearing for February 11, 2022.

On February 10, 2022, Smith filed a pro se "motion for reappointment of counsel." The motion alleged "a break down in communication and disagreement with the defense of the case." At the prescheduled hearing the next day, defense counsel explained he had not yet been able to secure a DNA expert. The court denied Smith's motion for new counsel and scheduled a status conference in 30 days.

Smith filed another pro se motion for new counsel on March 8, 2022. At a hearing three days later, the court denied the motion and defense counsel explained that Smith still did not have a defense expert. After speaking with other members of the defense bar, counsel learned that all experts, including DNA experts, were "really backed up right now and are pretty slow to get the information just because of their schedules." Based on this, counsel suggested it would be "three to six months before we would be in a position to even think about going to trial." Counsel also discussed Smith's constitutional speedy trial right, explaining that he was unsure whether that right could be waived and noted the primary inquiry was prejudice to the defendant. The court set a new trial date of October 24, 2022.

In the meantime, King died on April 11, 2022.

The court held another status conference on September 30, 2022. At this point, defense counsel had identified an expert witness. Defense counsel told the court that Smith agreed to request a continuance because "he would prefer that we have an expert and that we continue to explore this possibility of having the expert testify for us." The agreement was for the expert to conduct a "DNA case review" rather than retesting the DNA sample. The court asked defense counsel to speak with the expert to determine how long review would take and verify with BIDS that the costs would be covered. The court kept the trial date and continued the case until October 13, 2022.

At the October 13 status hearing, BIDS had still not approved the expert's funding. The court explained that if BIDS declined to pay for the expert, then the trial would begin on October 24 as planned. If, on the other hand, BIDS paid for the expert or defense counsel could not get an answer, then the trial would be continued.

Defense counsel ultimately moved for a continuance. The court granted the motion and set a new trial date of May 8, 2023. Both Smith and defense counsel signed a document, filed October 26, affirming a desire to continue the trial. In early November 2022, Smith sent a letter to the court arguing any DNA-related continuances should be charged to the State.

On April 5, 2023, the State notified the district court that King had died.

On May 1, 2023, Smith, through defense counsel, filed a motion to dismiss based on a constitutional speedy trial violation, which the district court later characterized as a motion to reconsider its previous denial of the speedy trial claim Smith made before his first trial. The motion did not discuss the time devoted to DNA analysis, but instead focused on King's death.

The court held a hearing on several motions on May 4, 2023. Regarding speedy trial, defense counsel argued King's death was prejudicial as he was the State's "key witness," and the jury would not be able to read King's body language during cross-examination. Counsel also noted that the elapsed time would cause witnesses to have memory problems. Further, defense counsel suggested the DNA delays were caused by the State because the State failed to initially test the DNA prior to Smith's first trial. The State replied that it was ready to try the case in January 2022, after it received its DNA report, and King died several months later, meaning the State did not prevent a jury trial that would have included King. The court denied the motion.

Smith's second trial began on May 8, 2023. At the trial, King's redacted testimony from the first trial was read to the jury. Defense counsel again raised a speedy trial argument following the close of the State's evidence. The court denied the request to reconsider its prior ruling. Defense counsel also raised the constitutional speedy trial issue in a postconviction motion for judgment of acquittal, which the court again denied.

*Discussion*

The Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights both provide a right to speedy trial. *State v. Otero*, 210 Kan. 530, 531, 502 P.2d 763 (1972). "It is . . . impossible to determine with precision when the right [to a speedy trial] has been denied." *Barker v. Wingo*, 407 U.S. 514, 521, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Instead, we have followed *Barker* in adopting a four-factor balancing test: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of the speedy trial right; and (4) prejudice to the defendant. *State v. Ford*, 316 Kan. 558, 561, 519 P.3d 456 (2022); *State v. Hayden*, 281 Kan. 112, 127, 130 P.3d 24 (2006) (observing this court adopted the *Barker* factors in *Otero*). "Because the test requires a balancing, none of these factors is a necessary or sufficient condition for

11

finding a violation. Instead, we consider them together along with any other relevant circumstances." *State v. Owens*, 310 Kan. 865, 869, 451 P.3d 467 (2019).

Our analysis begins and ends with the first factor:  the length of delay. Smith's challenge centers on the 21.5 months between the mistrial on July 19, 2021, and the beginning of his second trial, on May 8, 2023.

Two inquiries guide our analysis. First, we must decide whether the relevant interval "has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). If the delay was not presumptively prejudicial, our analysis ends. *Owens*, 310 Kan. at 872-73. Second, if we find the delay presumptively prejudicial, we "must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652.

The 21.5-month delay here was substantial; under different circumstances, other courts have deemed similar delays presumptively prejudicial. See, e.g., *State v. Ish*, 173 Idaho 930, ___, 551 P.3d 746, 759 (2024); *United States v. Snyder*, 71 F.4th 555, 577 (7th Cir. 2023), *rev'd on other grounds* 603 U.S. 1, 144 S. Ct. 1947, 219 L. Ed. 2d 572 (2024). But "whether the length of delay is presumptively prejudicial depends on the peculiar circumstances of each case, and the mere passage of time is not determinative." *State v. Weaver*, 276 Kan. 504, Syl. ¶ 3, 78 P.3d 397 (2003); see also *Owens*, 310 Kan. at 872. Instead, the analysis "is necessarily dependent upon the peculiar circumstances of the case"; for example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 530-31. "[U]nder *Barker*, the overarching consideration in determining whether the delay

is presumptively prejudicial is whether the delay is reasonable given the complexity of the case." *Owens*, 310 Kan. at 875.

Smith's crime, broadly speaking, was a drug-related attempted robbery that escalated to a fatal shooting. This was more complex than an ordinary street crime like *Owens*, for example, but less than the "complex" murder proceeding in *State v. Mathenia*, 252 Kan. 890, 895, 942 P.2d 624 (1997). *Owens*, 310 Kan. at 874. Even so, the lack of direct evidence implicating Smith complicates matters significantly:  Without eyewitness testimony at the retrial, the State had to rely on circumstantial evidence like DNA testing and cell phone records to prove Smith's involvement. Cf. *Owens*, 310 Kan. at 875 ("This was a simple and straightforward case, and the nature of the evidence involved does not justify a 19-month delay between Owens' arrest and trial.").

Nor can we ignore the events between trials. The State did not simply rest on its laurels. Instead, the State tested various items for DNA and obtained DNA from various individuals for comparison purposes. Once that analysis was complete, Smith worked with a different expert to evaluate the findings. This process injected more complexity into the already somewhat complex case.

In assessing presumptive prejudice, we are not concerned with who *caused* the delays between the mistrial and the second trial; that analysis would fall under the second *Barker* factor, if we were to reach it. See *Owens*, 310 Kan. at 874 (discussing *State v. Davis*, 277 Kan. 309, 85 P.3d 1164 [2004], as an example of improper conflation of the first and second *Barker* factors). But we cannot overlook either the State's difficulty in obtaining DNA evidence or the defense's need to appropriately respond to it within the overall complexity framework. Likewise, the delays in lab processing brought about by the COVID-19 pandemic further complicated matters and, thus, impact our overall analysis of what delay is *reasonable* given the circumstances.

Ultimately, we conclude that the delay here was not presumptively prejudicial. Instead, the delay was reasonable when viewing both the State's new evidence and Smith's need to rebut that new evidence in light of the purely circumstantial case for Smith's guilt—particularly viewed within the overall state of the world during and after the COVID-19 pandemic, which necessarily slowed all testing down.

Because we find the delay was not presumptively prejudicial, we reject Smith's claim that he was deprived of his constitutional right to speedy trial, without considering the remaining *Barker* factors. See *Owens*, 310 Kan. at 872-73.

*The prosecutor did not err during closing arguments.*

Smith argues the prosecutor committed three errors during closing arguments: the prosecutor's comments about Clifford's failure to identify Smith as his mother's killer, the prosecutor's argument that a not-guilty plea was not a declaration of innocence, and the prosecutor's remarks that, according to Smith, improperly diluted the State's burden of proof.

We apply a two-step analysis when reviewing claims of prosecutorial error. First, we consider whether the prosecutor exceeded the wide latitude prosecutors are given to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). This wide latitude extends to statements made during voir dire, opening statements, and closing arguments. We do not consider any statement in isolation, but rather look to the statement's context to determine whether error occurred. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020).

Second, if we find error, the State must demonstrate beyond a reasonable doubt that the error did not affect the trial's outcome considering the whole record, meaning "there is no reasonable possibility that the error contributed to the verdict." *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021); *King*, 308 Kan. at 30. We may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless. *Blevins*, 313 Kan. at 436-37. But while the strength of the evidence may inform our inquiry, it is not our primary focus; prejudice may be found even in strong cases. *State v. Sherman*, 305 Kan. 88, 111, 378 P.3d 1060 (2016) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 129 [1940]). A contemporaneous objection is not required to preserve claims of prosecutorial error for appellate review, although we may consider whether an objection was raised in our analysis of any alleged error. *Timley*, 311 Kan. at 949.

*The prosecutor did not err in discussing Clifford's failure to identify Smith.*

Smith first claims the prosecutor erred by arguing facts not in evidence as to Clifford's identification of Smith as his mother's killer. Before addressing this argument, we must first consider what transpired before and during Smith's *first* trial, which resulted in a hung jury.

Clifford identified Smith as his mother's killer at the preliminary hearing. But before the first trial, the defense moved to suppress Clifford's identification.

At the suppression hearing, Detective Michelle Palmer and Clifford both testified about Clifford's identification. Palmer testified that she showed Clifford a six-photo array the day after the shooting; Smith was included in this lineup because King had given his name to police. Clifford was unable to identify the shooter at this first meeting.

15

Around a month later, on November 7, 2016, Clifford contacted Palmer to say that he could now identify the shooter after looking up Smith's photograph; they met the next day, at which point Clifford identified Smith. Clifford told Palmer he learned Smith's name from his mom's friends that she worked with. Palmer also learned Smith's name from King.

The district court ruled that Clifford's identification was admissible. As the court put it, Clifford's "methods and his motives, as well as his credibility, will most certainly be vetted by way of cross examination from the defense."

During the first trial, Clifford testified that he was "100 percent sure" Smith was his mother's killer. Clifford admitted that he was unable to identify Smith at first, but later (after speaking with King) Clifford learned of Smith by obtaining his picture from an online database. Clifford again testified that he showed this photograph to detectives several weeks after Donna's shooting. Defense counsel impeached Clifford on his initial failure to identify Smith as his mother's killer; counsel also questioned Detective Palmer about Clifford's initial failure. And in closing, defense counsel thoroughly highlighted the flaws in Clifford's identification for the jury. As counsel put it:

> "[Clifford] did the thing none of us are supposed to do. He Googled it and he gets a
> picture and now he is convincing himself that he knows who did this, but that's all tainted
> and it's not supported by any other evidence."

In opening statements during the second trial, defense counsel discussed Clifford's flawed identification at some length, including an attempt to undermine Clifford's anticipated testimony that he was "100 percent" certain Smith was Donna's killer. But, contrary to the defense's reasonable expectations, the State did not ask Clifford to identify Smith, and thus there was no discussion of the photo lineup or Clifford's later

16

identification during the trial itself. Instead, during Smith's retrial, the prosecutor and Clifford shared the following exchange:

"Q. The guy that you saw that night that came into the apartment, how long in this whole thing would you say you got to look at his face?

"A. I seen his face the whole time. I will never forget the face.

"Q. To be fair, were you—you said you were laying facedown at parts. Right?

"A. Yeah.

"Q. So were you looking at him the whole time or were there interruptions?

"A. I wasn't looking at him the whole time when I was down on the ground, but, like I said, the glance of looking at him."

But the prosecutor never asked Clifford to identify Smith as his mother's killer—a concern defense counsel raised at the end of Clifford's testimony, to which the court agreed it had "noticed." Defense counsel expressed concern that the prosecutor would try to "bootleg" in Clifford's identification through a detective and asked that Clifford remain subject to recall. After denying that he had any new discovery to provide, the prosecutor replied: "The fact that I choose to put on or not put on or how I put on a piece of evidence, subject to the rules of evidence, is still, I believe, within my discretion."

As the trial progressed, the State made no effort to supplement Clifford's identification. Instead, during closing arguments, the prosecutor said:

"Clifford says a guy walked in and said give me the money and you get down. He got down on the ground. You know, he ate some carpet, I guess the phrase would be. He's laying there on the ground and he hears and he sees some things going on around him. He

17

says there was a tussle, I know I saw a tussle. He tells you that man's face is etched in my brain.

"*At some point somebody may ask you, well, why didn't he identify the defendant as the killer. The only non-speculative, non-assuming, non-guessing answer is this:  He wasn't asked.*" (Emphasis added.)

After the district court overruled defense counsel's objection, the prosecutor then said:

"You don't get to guess. You don't get to fill in the blanks and say, well, what would he have said if asked. You may have heard some statements in opening statement that related to that. You can't consider those because those are not evidence. Clifford wasn't asked.

"Let me pause for a moment. Assume or hypothetically think of a different situation. Instead of the man coming in with no mask on, a man comes in wearing a mask with enough skin exposed to say this is a black male. They heard his voice and said that's a black male. Nobody could identify him. Then what evidence do we have? You don't need Clifford O'Neal to say it was the defendant once you follow the evidence, ladies and gentlemen. You don't need Yeni to be able to identify who it was that committed the aggravated assault against her and the murder of Donna. You may like to know what would he say. Well, he wasn't asked. Don't speculate. Don't guess."

Following another overruled objection, the prosecutor went on:

"Well I'm not shifting any burden. I'm talking about the evidence, ladies and gentlemen, the evidence. He wasn't asked. You cannot assume, period. That's the law."

Then, after a third denied objection, the prosecutor said:

18

*"Okay. So let's bring it the other way. He would not have identified the defendant. No, that's not supported by the evidence, right.* That's what I'm talking about here, ladies and gentlemen. Follow the evidence, not some guesses." (Emphasis added.)

Smith claims the prosecutor's comments suggested that Clifford *would* have identified Smith, had he been asked to, and that the prosecutor thus "stepped outside the boundaries of permitted argument to ensure that the jury only got half the story (the incriminating half)" of Clifford's identification.

While we acknowledge the immediate intuitive appeal of Smith's argument, we find no error here when reviewing the prosecutor's remarks in context. The prosecutor was correct: the only *certain* reason Clifford did not identify Smith *on the stand* was because he was not asked to make an identification at all. To say more would have gone outside the evidence, and thus constituted error on its own.

Defense counsel took a risk in their opening statements by verbally anticipating evidence the prosecution would present. When that evidence was *not* presented by the prosecution, defense counsel's earlier discussion of Clifford's flawed identification in opening statements provided fair justification for the prosecutor's warning against speculation or guesswork. Consequently, we conclude the prosecutor's remarks did not stray outside the wide latitude afforded to prosecutors and thus were not error.

*The prosecutor did not err in arguing, as part of an objection, that a "not guilty" plea was not a declaration of innocence.*

Smith next claims the prosecutor erred by suggesting that Smith's not guilty plea was not synonymous with a declaration of innocence. Smith's claim arises from the following exchange during defense counsel's closing arguments:

19

"[Defense counsel:]  Well, they're trying to say that Robert did this and they have the burden of proof. Robert's pled not guilty, I didn't do this. So what do we do? well, the starting point is we look at our—

"[Prosecutor]:  Judge, I'm going to object to counsel inserting a statement by the defendant that wasn't made in evidence.

"[Defense counsel]:  Your Honor, we entered a plea of not guilty back in 2016.

"[Prosecutor]:  *That means the State has to prove it. It doesn't mean the defendant has said anything.*

"[The district court]:  I understand. I understand. The jury has been instructed about statements and arguments and remarks of counsel that are not evidence. I want them to follow that instruction as well as all the instructions. Go ahead." (Emphasis added.)

Smith points us to out-of-state authority suggesting that such remarks constitute error because they "undercut the axiomatic principle that a defendant is presumed innocent until proven guilty and need not declare or prove that he is innocent." But these cases are distinguishable. Unlike *United States v. Soto-Beniquez,* 356 F.3d 1, 42 (1st Cir. 2003)—or the other cases Smith cites—the prosecutor's challenged comment here came in reply to the defense's response to the prosecutor's objection, not as a component of the prosecutor's closing argument itself. See also *State v. Belgard*, 410 So. 2d 720, 723-24 (La. 1982) (comments arose during voir dire); *Rairdon v. State*, 557 N.W.2d 318, 324 (Minn. 1996) (comments made during closing); *State v. Wilder*, 124 N.C. App. 136, 142-43, 476 S.E.2d 394 (1996) (same); *State v. Jensen*, 308 Minn. 377, 379-80, 242 N.W.2d 109 (1976) (same).

In *State v. Kahler*, 307 Kan. 374, 383, 410 P.3d 105 (2018), we considered whether a prosecutor's objection during the defense's closing ("even one based on an

erroneous application of law") constituted prosecutorial error. In rejecting this claim, we concluded:

> "that it is within the prosecutor's permissible latitude to object that the defense is about to go beyond the admitted evidence in its summation to the jury. As we discuss below, the district court's ruling on the prosecutor's objection may have been erroneous. But this fact has no bearing on the determination of whether the objection itself was prosecutorial error." *Kahler*, 307 Kan. at 383.

While we do not categorically hold that all comments made during objections are exempt from the prosecutorial error paradigm, we recognize that the *target* of such comments is the judge—not the jury. As recognized in *Kahler*, the district court's *ruling* on an objection may be erroneous, but any such error does not catapult a prosecutor's arguments in furtherance of the objection into the realm of prosecutorial error. Further, the prosecutor's statement was correct: Smith had not *said*, "I didn't do this," by entering a legal plea of not guilty. Nor did Smith *testify*, "I didn't do this," so defense counsel's statement to that effect did not constitute evidence for the jury to consider. Again, we find no error here.

*The prosecutor did not dilute the burden of proof.*

Smith next argues the following comments—made by the second prosecutor during rebuttal—diluted its burden of proof:

> "[D]efense counsel kept saying find reasons to doubt. Nowhere in these instructions does it say you must scour to look for reasons to doubt. It is true the State from the very beginning and throughout this whole process has the burden of proof. We have to prove to you beyond a reasonable doubt that the defendant did these crimes. There's nothing in these instructions saying you have to scour looking for doubts."

Because a prosecutor may err "'by making arguments that dilute the State's burden of proof or attempt to define reasonable doubt,' . . . 'prosecutors embellish on the definition of the burden of proof in criminal cases at their peril.'" *State v. Thomas*, 307 Kan. 733, 743, 415 P.3d 430 (2018). But we have not previously addressed statements like the ones Smith challenges here, and, as with his previous claim, Smith supports his argument solely with out-of-state authority.

Again, we find Smith's authority distinguishable. In each of Smith's cited cases, the appellate courts found nonreversible error based on slightly different expressions of the notion that a jury's task is to search for truth, not reasonable doubts. *United States v. Williams*, 690 F.3d 70, 77 (2d Cir. 2012) ("'this is not a search for reasonable doubt. This is a search for truth . . .'" nonreversible error because it failed to properly frame the question for the jury); *State v. Medina*, 147 N.J. 43, 54, 685 A.2d 1242 (1996) (trial court's instruction, "[w]hile it is your duty to give the defendant the benefit of every reasonable doubt, you do not search for doubt, you search for truth" held nonreversible error because it "improperly eases the State's burden" and because "the jury's duty is to scrutinize the evidence and search for doubt"); *State v. Berube*, 171 Wash. App. 103, 120-21, 286 P.3d 402 (2012) ("'you search for the truth, not a search for reasonable doubt'" non-reversible error because it "'impermissibly portrayed the reasonable doubt standard as a defense tool for hiding the truth, and suggested that a jury's scrutiny of the evidence for reasonable doubt is inconsistent with a search for the truth'"); *People v. Robinson*, 83 A.D.2d 887, 887, 442 N.Y.S.2d 119 (1981) ("'You are not here to search for reasonable doubt. You are here to search for the truth'" nonreversible error because it was an "attempt . . . to subvert the law relative to reasonable doubt.").

But the prosecutor's remarks here are different. By tying his comments to the jury instructions—which, indeed, did *not* instruct to "scour to look for reasons to doubt"—the prosecutor did not misstate the law. Nor did the prosecutor tell the jury its job was to

"search for truth" and thus imply that reasonable doubt was incompatible with truth. We thus find no error in the prosecutor's arguments.

*The district court did not violate Smith's right to present a complete defense.*

Smith next claims the district court violated his right to present a third-party defense by preventing him from arguing that King was O'Neal's killer, or by preventing him from introducing an arrest warrant stemming from a probation violation to explain how certain comments Johnson attributed to him had been misconstrued. Both arguments ultimately tie back to the district court's findings on relevance, including (1) that Smith had no relevant evidence to suggest that King committed the crime, and (2) that the probation violation warrant was irrelevant because there was no evidence Smith knew about it at the time he made the statements to Johnson.

*Standard of review*

"[U]nder the state and federal Constitutions a defendant is entitled to present the theory of his or her defense and that the exclusion of evidence that is an *integral* part of that theory violates a defendant's fundamental right to a fair trial . . . . The right to present a defense is, however, subject to statutory rules and case law interpretation of rules of evidence and procedure. [Citations omitted.]" *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003).

We review de novo claims that a district court's ruling has interfered with a defendant's right to present a defense. E.g., *State v. Waldschmidt*, 318 Kan. 633, 657, 546 P.3d 716 (2024); *State v. Macomber*, 309 Kan. 907, 921, 441 P.3d 479 (2019).

"To constitute error, the excluded evidence supporting the defense theory must be relevant, noncumulative, and admissible. We review this type of alleged error de novo.

23

"Unless barred by statute, constitutional provision, or caselaw, 'all relevant evidence is admissible.' For relevancy, there are two elements: materiality and probativity. We review the former de novo and the latter for abuse of discretion. A court abuses its discretion when no reasonable person could agree with its decision or if its exercise of discretion is based on a factual or legal error. [Citations omitted.]" *Waldschmidt*, 318 Kan. at 657.

But we review a district court's decision to exclude evidence based on the third-party evidence rule for abuse of discretion based on the "'totality of facts and circumstances in a given case.'" *State v. Tahah*, 293 Kan. 267, 274, 262 P.3d 1045 (2011) (quoting *State v. Adams*, 280 Kan. 494, 505, 124 P.3d 19 [2005]). See also *State v. Carr*, 300 Kan. 1, 197, 331 P.3d 544 (2014) ("[T]he appellate standard of review for a district judge's ruling on a motion in limine invoking the third-party evidence rule is abuse of discretion."), *rev'd and remanded* 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016).

*Preservation*

The parties litigated both sub-issues below. But the State now argues that Smith failed to preserve his claim as to King because the "defendant never proffered the exact manner in which he wanted to 'argue' or 'suggest' King's guilt to the jury." The State rhetorically asks, "Did counsel plan to make this suggestion in opening statement or closing argument, or through his cross-examination of King or other witnesses?" But we reject this framing, which requires far more specificity than we have historically required.

"When a motion in limine has been granted, the party being limited by the motion has the responsibility of proffering sufficient evidence to the trial court in order to preserve the issue for appeal. The purpose of a proffer is to make an adequate record of the evidence to be introduced.

> "The proponent of excluded evidence has the duty of making known the 'substance' of the expected evidence in a proffer. A formal offer of proof in question and answer form is not required if an adequate record is made in a manner that discloses the evidence sought to be introduced. Failure to make a proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion. [Citations omitted.]" *Evans*, 275 Kan. at 99-100.

See also *State v. Burnett*, 300 Kan. 419, 431-33, 329 P.3d 1169 (2014) (distinguishing adequate proffer that another person committed the crime from inadequate proffer that the house was a "drug house" or that police found weapons there).

Here, defense counsel proffered the following facts:

- Smith and King "look an awful lot alike," have "similar builds," "their weights are similar, their heights are similar, their facial features are similar. They're both bald black men. They both fit the description given by the eyewitness to 911."
- Donna was killed by a .25 caliber bullet, and King had admitted to an earlier possession of a .25 caliber handgun.
- King had lived in the same apartment complex as Donna, was friends with Donna, and knew that Donna sold drugs.
- King learned Donna had been killed the next day "when I came to work."
- The police "came and got [King] from work" to ask him about the tip he gave to Donna about Smith's planned robbery.
- King was the one to tell Clifford that Smith had previously threatened Donna.

The defense also explained its proposed theory: that King, who ostensibly resembled Smith, committed the crime and attempted to deflect blame by accusing Smith.

25

And while the defense was ultimately able to present some of this evidence to the jurors, the court's ruling still prevented them from tying it all together—which is the core of Smith's complaint. We thus reject the State's position that, to obtain appellate review, defense counsel had to lay out its exact strategy in exhaustive detail. It suffices that the defense explained its theory with reasonable clarity and showed the court sufficient evidence they intended to present in good faith support of that theory, which is the case here.

*The district court's exclusion of third-party evidence as to King.*

Regrettably, "our caselaw on the admissibility of third-party evidence has not always been a model of clarity." *State v. Cox*, 297 Kan. 648, 660, 304 P.3d 327 (2013). But, at a minimum, third-party evidence "must 'effectively connect the third party to the crime charged'" and "must reveal more than motive to be relevant." *Tahah*, 293 Kan. at 274 (quoting *Adams*, 280 Kan. at 505). "Mere speculation" and "baseless innuendo" are insufficient. *Cox*, 297 Kan. at 660-61; *Brown*, 285 Kan. at 305. Conversely, evidence linking another person directly to the commission of a crime is relevant and generally should not be excluded. See generally *State v. Marsh*, 278 Kan. 520, 529-33, 102 P.3d 445 (2004), *rev'd and remanded on other grounds* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), *and vacated in part on other grounds* 282 Kan. 38, 144 P.3d 48 (2006); *Evans*, 275 Kan. at 99-100.

The State's pretrial motion in limine asked the court to prevent the defense from "presenting evidence, arguing or otherwise discussing" the theory that King was Donna's killer. After reviewing the proffered facts and noting that nothing suggested King was "there" on the night of the murder, the district court ultimately concluded that "I just don't believe there's sufficient evidence. I just think based on the third party rule that the evidence that I've heard that the defense wants to put forward is not relevant." And

although defense counsel complained that the court's ruling left him "at a loss" and with no defense, the district court was unmoved. The district court later reaffirmed its rulings as to the proposed defense regarding King at the retrial.

Smith argues that his theory hinged on King's "intimate" connection to the case and thus "went much further than" mere resemblance. But none of the facts proffered remotely suggest that King shot Donna—particularly since Clifford, who saw the shooter *and* sought out King for information later, both (1) never asserted that King was the culprit *and* (2) claimed that he had met King before Donna's death. In contrast, at the second trial, Clifford testified that he "had never seen [the killer]" before, and at both trials he testified that he did not know Donna's killer, but that Donna seemed to. This key failure undermines the defense's claim that Smith and King apparently resembled one another. Even so, nothing shows King was near Donna's apartment on the night of the murder; on the contrary, King's testimony suggests he was living in a different apartment at the time, after having parted ways with his old friend Black in August, two months before Donna's murder. And no DNA evidence implicated King, either.

While Smith's proffered facts show King's roundabout connection *to* the crime, they do not show his involvement *in* it—and, thus, are irrelevant to show King's identity as Donna's true killer, since there is no evidence that the killer acted with an accomplice. Instead, the purported connection here consists of "baseless innuendo" that would merely confuse and distract the jury with "'speculations on collateral matters wholly devoid of probative value relative to who committed the [crime].'" *Brown*, 285 Kan. at 303, 305 (quoting *Marsh*, 278 Kan. at 530-31). We find no error in the district court's decision.

*The district court's exclusion of Smith's probation violation warrant.*

*Additional facts*

During an interview with detectives on the afternoon of October 10, 2016—a day and a half after Donna's murder—Smith's then girlfriend, Johnson, reported phone conversations with Smith beginning October 9 and running into the morning before the interview. Johnson reported that, on the evening of the murder itself and even through 5 p.m. on October 9, when he left the apartment, Smith was calm and acted like nothing happened. But after police raided Johnson's sister's house, Johnson called Smith and asked why the police were at her sister's house; Smith called Johnson back, and when Johnson again brought up the raid, Smith kept saying, "I'm sorry, I'm sorry, I fucked up, I'm sorry." Johnson told detectives Smith called her again later that night, saying, "I fucked up, I'm sorry . . . I'm going to have to go turn myself in." The two had a similar exchange on the morning of October 10.

But Smith never told Johnson exactly what happened. During at least one of the conversations, Johnson asked Smith what he had done; Smith only responded that he had fucked up and would turn himself in. The police told Johnson's sister that Smith had shot somebody; Johnson told Smith "they said that you shot somebody" and Smith responded, "I fucked up, I fucked up, I'm sorry." Johnson agreed with a detective's question that he seemed to be acknowledging her statement "you shot somebody" with his answer. And during one of the calls, Smith accused Johnson of being with the police and trying to set him up; Johnson said that she was trying to get Smith to understand what the police said he had done, and asked why he kept calling her when there was nothing she could do.

The State played Johnson's recorded interview for the jury during the second trial. On the stand, Johnson testified that, over multiple conversations, Smith said "he was

28

sorry for ruining my life" and that "he didn't mean to F up my life." Johnson also testified that Smith never told her what had happened; he just said he was sorry for ruining her life and hurting her family.

Defense counsel asked if Johnson knew Smith was on probation, that he had not kept up on his fines, and that he had had a "bad UA"; she testified that she did. But Johnson did not know that there was a warrant out for Smith's arrest until after the shooting. The defense brought up a warrant for Smith's arrest based on a probation violation during Johnson's testimony, but was unable to introduce it. The defense tried again during Detective Palmer's testimony, but the district court held that the defense had not shown it was relevant because there was no evidence Smith knew about it when he made the statements to Johnson. Regardless, during closing, defense counsel discussed the probation violation as the basis for Smith's "turning himself in" comment.

*Discussion*

Smith argues that the probation revocation warrant explained what he meant when he told Johnson that he had "fucked up" and apologized for "ruining [her] life," which the State later argued was a confession. Smith claims the warrant was central to his claim of innocence and that the district court violated his right to a fair trial by concluding that, because the defense failed to show Smith was aware of it when he made the statements to Johnson, it was irrelevant.

We are unpersuaded. When a district court permits a defendant to present a defense but "simply exclude[s] one piece of [relevant] evidence," "a constitutional issue is not at stake," and this court thus reviews for abuse of discretion. *State v. Alderson*, 260 Kan. 445, 461, 922 P.2d 435 (1996). Instead, a district court only "violates a criminal defendant's fundamental right to a fair trial if the court excludes relevant, admissible, and

29

noncumulative evidence *that is an integral part of the theory of the defense*." (Emphasis added.) *State v. Banks*, 306 Kan. 854, 865, 397 P.3d 1195 (2017); *State v. King*, 293 Kan. 1057, 1063, 274 P.3d 599 (2012). Moreover, "To constitute error, the excluded evidence supporting the defense theory must be relevant, noncumulative, and admissible." *Waldschmidt*, 318 Kan. at 657.

The warrant (which the district court admitted for appeal) was hardly integral to Smith's defense. It was issued in March 2016 based on various probation failures, including positive UAs and a failure to report in person. But the defense introduced nothing to show that Smith knew that the warrant had been issued, much less to explain why he would suddenly bring it up to Johnson seven months after its issuance in the context of police searching her sister's home. Thus, we find merit in the district court's explanation that Smith would have to show he *knew* of the warrant for it to be relevant.

Further, Johnson testified that she knew Smith was on probation at the time, knew Smith had not paid his fines, and knew that he had a "bad UA." Johnson did not know there was a probation violation warrant for Smith's arrest at the time, though she later learned of it.

Because the warrant was not integral to the defense's case, the district court's refusal to admit it becomes a matter of discretion. And without evidence that Smith was specifically aware of *this* warrant—or why he would suddenly bring it up seven months after its issuance—it is unclear how the warrant would either be material (i.e., have "'a legitimate and effective bearing on the decision of the case and is in dispute'") or probative (i.e. have "'any tendency in reason to prove a fact'"). *State v. Boleyn*, 297 Kan. 610, 622, 303 P.3d 680 (2013). We find no error here.

*Even if the district court erred in permitting the State to amend its information before the case was submitted to the jury on retrial, any error was harmless.*

Smith next challenges the district court's decision to allow the State to amend its information during the retrial "to allege a different elemental version of a criminal possession of a weapon offense" than previously charged. Smith preserved this issue for appeal.

*Standard of review*

Under K.S.A. 22-3201(e), "The court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." Appellate courts review a district court's decision to allow an amended information for abuse of discretion. *State v. Donaldson*, 279 Kan. 694, 712, 112 P.3d 99 (2005). Further, to the extent Smith's argument requires statutory interpretation, the court's review is de novo. *State v. Lamia-Beck*, 318 Kan. 884, 886, 549 P.3d 1103 (2024).

*Discussion*

"A two-part analysis determines whether an amendment prior to submission of the case to the jury may be permitted: (1) Does the amendment charge an additional or different crime? (2) Are the substantial rights of the defendant prejudiced by the amendment?" *State v. Matson*, 260 Kan. 366, 370, 921 P.2d 790 (1996). Smith focuses on the first part of the analysis, maintaining that count six of the second amended information charged a new crime because the elements were different than that of the previous count six. Smith further argues that, because the district court permitted the amendment, it forced the defense to enter an unnecessary stipulation that would have

31

made it difficult for the jury to "cabin[] their consideration of an accused's prior crime for strictly proper purposes" and was thus "highly prejudicial." But Smith makes no argument under the second half of the analysis, i.e., that the *amendment* prejudiced his substantial rights; he merely claims any error was not harmless because of the stipulation rendered necessary *by* the court's decision allowing the amendment.

As the defense highlighted below, the distinction between the amended information and the second amended information lies in the final lines of count six:

> "[T]o-wit:  Possession of Marijuana with Intent to Sell, pursuant to KSA 65-4163(a)(3) on the 23rd day of January, 2012, in the Eighteenth Judicial District Court, under Case No. 2009CR3371, *and was found to have been in possession of a firearm at the time of the commission of the crime*." (Emphasis added.)

> "[T]o-wit:  Possession of Marijuana with Intent to Sell, pursuant to KSA 65-4163(a)(3), on the 23rd day of January, 2012, in the Eighteenth Judicial District Court, under Case No. 2009CR3371, *and was found not to have been in possession of a firearm at the time of the commission of the offense*, and has not had the conviction expunged or been pardoned for such crime." (Emphasis added.)

The first amended information listed the statutory basis for the charge as K.S.A. 21-6304(a)(1); the second amended information listed K.S.A. 21-6304(a)(3)(A).

Smith argues that, because the elements of the two charges are different, they constitute different crimes. While Smith cites no authority mandating this approach in the context of mid-trial amendments to charging documents, he argues the *Mathis v. United States*, 579 U.S. 500, 511-12, 136 S. Ct. 2243, 195 L. Ed. 2d 604 (2016), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), definition of "'crime' ought to apply" to K.S.A. 22-3201(e). But see *State v. Lowe*, No. 110,103, 2015 WL 423664, at *3 (Kan. App. 2015) (unpublished opinion) (although amendment

32

changed the elements the State was required to prove, the amendment did not charge a new crime because it "only changed the *theory* that would support the charge for trafficking in contraband in a correctional institution") (citing *State v. Starr*, 259 Kan. 713, 720, 915 P.2d 72 [1996]).

We assume without deciding that Smith has shown that the elements of the two count sixes are different. We further assume without deciding that this makes the new count six a "different crime." Smith argues that, at a minimum, a finding of error here would require reversal of Smith's conviction for criminal possession of a weapon, and at most requires reversal of all his convictions. We disagree.

We have not previously considered whether an error under K.S.A. 22-3201(e) can be harmless when a mid-trial amendment to an information or complaint charges a new or different crime. Our older caselaw suggests that it cannot. See, e.g., *State v. Wilson*, 240 Kan. 606, 608-09, 731 P.2d 306 (1987), *overruled by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *State v. Scherer*, 11 Kan. App. 2d 362, 369, 721 P.2d 743 (1986); *State v. Hoover*, No. 65,888, 1991 WL 12018514, at *2 (Kan. App. 1991) (unpublished opinion). But this caselaw turned on a point we have since repudiated:  the notion that a charging document confers subject matter jurisdiction on a court. As we have clarified, district courts do not draw their subject matter jurisdiction from charging documents. *Dunn*, 304 Kan. at 811.

Rather than the older focus on subject matter jurisdiction, our concern with a mid-trial amendment under K.S.A. 22-3201(e) turns on due process notions of notice and fundamental fairness, along with double jeopardy. Cf. *State v. Rasch*, 243 Kan. 495, 497, 758 P.2d 214 (1988). In many cases, these concerns would be fatal to a mid-trial amendment. But not so here. Cf. *Lowe*, 2015 WL 423664, at *3 (noting circumstances in which an amendment to an information does not interfere with a defendant's ability to

defend against the charge, including "when the evidence is the same under the original information and the amendment," "when the defendant has always been aware of the evidence supporting the amendment," and "when the defendant can keep the same defense under the amendment"). Here, the State's amendment to count six merely charged the underlying theory of criminal possession of a firearm to comport with evidence that both parties had access to all along—including throughout Smith's *first* trial, where neither of them apparently caught the discrepancy. Further, Smith did not argue below—and does not argue now—that the amendment prejudiced his substantial rights. He has thus waived any such argument. E.g., *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018).

Consequently, we find any error harmless. While Smith complains that the amendment forced him into an unnecessary stipulation—a distinct claim from the statutory test of prejudice to his substantial rights owing to the amendment itself—we conclude that the stipulated conviction could have had little impact on the jury's assessment of the evidence before it. True, Smith's prior crime involved drugs, and the State's theory of his current crimes centered on an attempted drug-related robbery. But Smith's prior conviction—possession of marijuana with intent to distribute—was not one involving violence and would not have suggested to the jury that Smith was particularly likely to commit the charged crimes here, particularly because the parties' *new* stipulation expressly noted that Smith "was not found to be in possession of a firearm at the time of the prior crime." This stipulation would have had even less impact on the jury's assessment of the evidence than the stipulation the parties entered at the first trial, which said, among other things, "the defendant *was* found to be in possession of a firearm at the time of the prior crime." (Emphasis added.) Thus, even assuming error, any error was harmless.

*Cumulative error did not deprive Smith of a fair trial.*

Smith briefly argues that cumulative error deprived him of a fair trial.

"Cumulative trial errors may require reversal when, under the totality of the circumstances, the combined errors substantially prejudice a defendant and deny a fair trial. The cumulative error rule does not apply if there are no errors or only a single error. [Citations omitted.]" *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023).

Here, we have only assumed without deciding that one error occurred. The cumulative error rule thus does not apply to afford Smith relief.

*The district court erred in counting Smith's 2003 criminal threat conviction as part of Smith's criminal history score.*

Finally, Smith claims that the district court erred by including his prior criminal threat conviction in his overall criminal history score and, thus, his sentence is illegal. We agree.

*Standard of review*

Smith's challenge to his sentence requires us to interpret K.S.A. 21-6810(d)(9). We exercise unlimited review over both interpretation of statutes and claims involving illegal sentences. E.g., *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024).

When a defendant challenges their criminal history score at sentencing, the State bears the burden of proving that score by a preponderance of the evidence. K.S.A. 21-6814(a)-(c); *Daniels*, 319 Kan. at 347-48. In the face of such a challenge, the presentence

35

investigation (PSI) report is no longer sufficient to carry the State's evidentiary burden. 319 Kan. at 347.

*Discussion*

K.S.A. 21-6810(d)(9) provides that "[p]rior convictions of a crime defined by a statute that has since been determined unconstitutional by an appellate court shall not be used for criminal history scoring purposes." As the majority recognized in *State v. Phipps*, 63 Kan. App. 2d 698, 711, 539 P.3d 227 (2023), *rev. granted* 318 Kan. 1089 (2024), a "literal reading" of K.S.A. 21-6810(d)(9) implies that reckless criminal threat convictions can never be included in a criminal history score "because at one point in time, the Kansas Supreme Court determined that the reckless criminal threat statute violated the First Amendment."

We now acknowledge as correct this "literal reading." In matters of statutory interpretation, our prime directive requires us to give effect to the Legislature's intent, if we can discern it. *Bruce v. Kelly*, 316 Kan. 218, 224, 514 P.3d 1007 (2022). Where the Legislature's language is plain and unambiguous, our analysis ends—regardless of public policy considerations or canons of construction. E.g., *Woessner v. Labor Max Staffing*, 312 Kan. 36, 44-45, 471 P.3d 1 (2020). But see *Bruce*, 316 Kan. at 224 ("even when the language of the statute is clear, we must still consider various provisions of an act *in pari materia* to reconcile and bring those provisions into workable harmony, if possible").

Our Legislature's direction was clear. If a prior conviction arose under a statute "that has since been determined unconstitutional by an appellate court," it cannot be counted in a criminal history score. Nothing in the plain language of the statute qualifies this limitation by considering *subsequent repudiations* of an appellate court's holding that a statute is unconstitutional.

36

As applied here, *Boettger*, 310 Kan. at 822, held that the portion of K.S.A. 2018 Supp. 21-5415 criminalizing reckless criminal threat is unconstitutional. This holding further invalidated the corresponding portion of K.S.A. 2003 Supp. 21-3419, under which Smith's 2003 conviction arose. And while the parties argue at length as to whether *Counterman v. Colorado*, 600 U.S. 66, 81-82, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023), effectively overruled *Boettger*, this consideration is irrelevant under the plain language of K.S.A. 21-6810(d)(9), which asks *only* whether an appellate court "has since" ruled the statute unconstitutional—not whether that holding remains good law.

Because Smith raised this issue before sentencing, the State bore the burden of proving that Smith's conviction arose under the portion of the statute that had not been previously declared unconstitutional. K.S.A. 21-6814(c). The State presented no evidence to carry this burden, instead focusing on whether *Counterman* overruled *Boettger*. Because the State failed to carry its evidentiary burden that Smith's 2003 conviction arose under a portion of the statute that remained constitutional after *Boettger*, the district court erred in including Smith's 2003 conviction in his criminal history score. We thus vacate Smith's sentences and remand to the district court for resentencing, with directions not to include Smith's 2003 criminal threat conviction in Smith's criminal history score.

CONCLUSION

We affirm Smith's convictions, vacate his sentence, and remand the case for resentencing.